People of State of Illinois, Defendant in Error, v. William M. Estep and Dora Estep (Impleaded), Plaintiffs in Error.

Gen. No. 45,496.

Opinion filed February 11, 1952. Rehearing denied March 25, 1952. Released for publication March 25, 1952.

DARROW, SMITH & CARLIN, of Chicago, for plaintiffs in error; WILLIAM L. CARLIN, and LOUIS A. ROSENTHAL, both of Chicago, of counsel.

IVAN A. ELLIOTT, Attorney General of Illinois, of Chicago, for defendant in error. JOHN S. BOYLE, State's Attorney, JOHN T. GALLAGHER, RUDOLPH L.

JANEGA, ARTHUR F. MANNING, and WILLIAM J. McGAH, Assistant State's Attorneys, all of Chicago, of counsel.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

William M. Estep and Dora Estep, his wife, together with Abe Simon, Earl Edward Southard and Sadie Stafford, were indicted in the criminal court of Cook county on November 25, 1949, upon a charge of conspiracy. Counts 1, 2, 3 and 4 allege conspiracy by the defendants with each other and with Velma Mills, Daniel Mills, Anna Huber, Ethel C. Tarpey, Frank Handzik, Ethel Handzik, Lillian Meiers, Alma Meiers, Clara Mae Boyer, Amelia C. Scarlett "and with divers other persons whose names are unknown to said grand jurors," to violate the Medical Practice Act. Count 5 alleged conspiracy by the same persons to perpetrate a confidence game and Count 6 alleged conspiracy to obtain money under false pretenses. There was a trial by jury. The defendant, Abe Simon, was severed before the beginning of the trial upon motion of the People, representation being made to the court that he was going to be a State's witness. The remaining defendants pleaded not guilty. At the close of the State's case, upon motion of counsel for defendants, with the consent of the attorneys for the State, Earl Southard and Sadie Stafford were directed out of the case, leaving only the remaining defendants, William M. Estep and Dora Estep, his wife. The jury found the Esteps guilty of conspiracy as charged in the indictment, fixed their punishment at imprisonment in the penitentiary and assessed a fine of $2,000 against each. On June 29, 1950, the court entered judgment on the verdicts and sentenced William Estep to the penitentiary for a minimum term of 3 years and a maximum term of 5 years and to pay a fine of $2,000, and sentenced Dora Estep to the penitentiary for a

134

minimum term of 1 year and a maximum term of 2 years and to pay a fine of $2,000. Motions on behalf of each defendant for a directed verdict, a new trial and in arrest of judgment were overruled.

Defendants sued out a writ of error in the Supreme Court to reverse the judgment. The first point urged by defendants is that they have the right to a direct appeal to the Supreme Court because constitutional questions of freedom of religion and denial of due process of law are involved. That court in transferring the case held that there were no grounds for a direct appeal. (*People v. Estep,* 409 Ill. 125.)

We turn to a consideration of defendants' contention that they were practicing faith healing, which is excepted from the licensing requirements of the Medical Practice Act and that they are protected by the constitutional guarantee of religious freedom. Section 37 of the Medical Practice Act (par. 16v, ch. 91, Ill. Rev. Stat. 1951 [Jones Ill. Stats. Ann. 79.38]) provides that the Act shall not apply to persons treating human ailments by prayer or spiritual means as an exercise or enjoyment of religious freedom. We have carefully studied the transcript of the testimony. To paraphrase the statement of the Supreme Court, the record shows that certain physical instruments were used by the defendants for the benefit of their patients, one of which aided in determining the acid as well as the alkaline content of the patient's body. Based upon the showing of an instrument known as the Estemeter, the patient would be informed as to his need of certain vitamins if a deficiency were indicated. Another instrument used was known as the Roto-Ray, which caused certain colored rays to pass from the air into the water, and which, it was claimed, changed the chemical content thereof and created atomic water, which was given the patients to drink. Another machine known as the Vita-Ray dispensed electricity through

certain pads into the body and was used in administering heat treatments.

There was testimony that during all treatments the patient was requested to pray and that prayer was used by the attendant so that the will of the patient would be joined with the will of God at that time; that the patient was told that God alone cures disease and that no man or remedy ever cured any ailment whatsoever; that the healing of human ailments by a divine healer, psycho-physician, which defendants held themselves out to be, is accomplished through prayer and spiritual means; that investigation of illness is to ascertain the condition of the life energy, atomic deficiency and vitamin deficiency of the body and is not a diagnosis of disease; that this is necessary to comply with God's laws of healing; that none of the methods used are represented as cures for disease, since God alone cures; that each patient signed an instrument stating his understanding to be in substance as above indicated; that he understood he was to make a free-will contribution for the healing Ministry of the Central Baptist Church of Chicago, Inc.; and that all moneys subsequently paid would be a like or similar contribution to this Ministry. William M. Estep was pastor of that church. In June 1947, the Esteps and Lillian Meiers executed a common-law trust establishing the Baptist Missionary Alliance to solicit funds to promote the work of God and publish literature on Christian psychology. Lillian Meiers then signed a certificate ordaining William Estep a minister. In August 1947, the same three persons incorporated the National Institute of Orthoptics to establish and maintain classes and also rest homes. The most important class was for Christian psycho-physicians. For this class there was a fee of $500 which went to Estep. This course and others consisted mainly of lectures by Estep on his healing ability. He had discovered that

sickness is caused by a deficiency of life atoms and that one can be cured of anything by supplying the missing atoms which he could take from the air and place in water. He had different instruments which he invented, including the Kansevisor, Vita-Ray, Roto-Ray and Estemeter. All of these were used in either diagnosis or cure of disease. He sold these to his students. Nominally he may have received the purchase price in the form of voluntary contributions, but the contributions were always the same for the same machine. After the classes were under way Estep placed some of the brighter students in the office to treat patients. They received nominal salaries and all "contributions" received from the patients over and above expenses went to the Missionary Alliance of which the Esteps were lifetime officers. Other "graduates" who went outside to practice turned 1/10th of their income over to the Alliance. He then established a rest home, ostensibly for the use of all the ministers (graduates of Estep's school), but until after the indictment was returned, it was primarily a dwelling place for the Esteps. Eventually they ostensibly relinquished control of the office and turned it over to the Ministerial Fellowship of the Missionary Alliance, but all acts of the fellowship were subject to veto by a majority of the trustees of the Alliance. The Esteps constituted the majority of the trustees. There was testimony that William Estep stated to one of his classes that a medical doctor's license could be revoked, but their licenses could not be revoked as they were practicing their religion.

■■ Faith healing is specifically permitted under the Medical Practice Act. It is a question of fact in each case whether or not a faith healer is legitimately exercising his religious freedom or merely using religion as a subterfuge to practice medicine illegally. In this case the evidence shows that the defendants

137

used religion and faith healing only as a shield. They were entirely mercenary in their activities. The evidence shows that the Kansevisor, Vita-Ray, Roto-Ray, Estemeter and "atomic water" were used by defendants as physical agencies to deceive and defraud the unfortunate and unwary. There is no merit in defendants' contention that as faith healers they were excepted from the licensing requirements of the Medical Practice Act and protected by the constitutional guarantee of religious freedom. They were violating the Medical Practice Act. Under the facts no question arises as to the violation of a constitutional guarantee of religious freedom. Certainly the defendants' right to religious freedom has not been infringed. See *People v. Handzik,* 410 Ill. 295.

 Defendants maintain that they are not guilty of any of the charges. We are satisfied that the evidence shows they are guilty of conspiring to violate the Medical Practice Act. They established the bare form of a church as a shield behind which to conduct their business of treating the sick for profit and using physical apparatus in their treatment. Under the evidence the jury had a right to find that prayer and spiritual exercise were not invoked in good faith, but only for the purpose of evading the provisions of the Medical Practice Act. In our view defendants were also guilty of conspiring to obtain money under false pretenses. Fixed charges were made for everything, including attendance at classes, the purchase of the machines and for the treatments. Ostensibly, all these were voluntary contributions. However, the contribution for a specific service or machine was always the same. Defendant, William Estep, referred to the "twenty-dollar treatment" when talking to one of his patients. The money received, with the exception of that paid out for the expense of maintaining the loop office, went either to the defendants personally, to

them as trustees and life officers of the Alliance, or was used to maintain them as the only permanent residents of the rest home, and no accounting of the money was made to anyone by them. The record is replete with false representations by defendants, such as that the Vita-Ray would put carbon atoms into the cells of the body; that the Estemeter would determine the excess of alkaline or acid in the glands; that the Roto-Ray would make water radio-active; and that drinking such water would make one immune from an attack by atomic bombs. It is inconceivable that anyone would "contribute" for one of these devices or for a treatment with one of them if he did not think that the machines and treatments would cure disease. There was evidence that the defendants were guilty of conspiracy to obtain money by means of the Confidence Game. A Confidence Game, as defined in *People v. West*, 406 Ill. 249, 252, is any scheme whereby a swindler wins the confidence of one by some false representation or device and then swindles him of money or property by taking advantage of the confidence, and the form of the transaction is immaterial. Relying upon mankind's inherent faith in God and hope for the cure of disease, defendants set themselves up as the possessors of devices that would simplify divine intervention and would cure disease. By this scheme they thus conspired to win the confidence of their victims.

■ Defendants argue that they did not have a fair trial because an attorney representing the Chicago Tribune sat at the counsel table and conferred with the Assistant State's Attorney during the trial. The record does not show that he took an active part in the trial. The trial judge did not agree that he conferred with any Assistant State's Attorney during the trial. There is no showing that the jury knew who he was or that they were influenced by his presence at the trial. We are of the opinion that defendants were not

139

prejudiced by the presence of this attorney during the trial.

 Defendants assert that the court erred in denying their motion to keep the jury together during the trial. Representations were made to the court that articles appearing in the Chicago Tribune would prejudice the jury against defendants. The defendants were charged with a misdemeanor. It was apparent that the trial would be lengthy. It did, in fact, last three weeks. The trial judge admonished the jurors not to read any newspaper accounts of the trial and the jurors promised that they would not. The newspaper accounts of the trial consisted, with one exception, of a factual summary of the day's evidence. The one exception contained matters not in evidence, but appeared only in an early edition of the Chicago Tribune and on one of the back pages. There is no showing that any of the jurors read the item or any other account of the trial, or that if they did read it, they were influenced by it in any way.

Defendants say that they did not have a fair trial because of the misconduct of Mr. Edward F. Healy, one of the Assistant State's Attorneys. The trial lasted three weeks. In several instances the trial judge sustained objections to Mr. Healy's remarks and instructed the jury to disregard them. In our opinion the defendants were not prejudiced by the conduct of the Assistant State's Attorney.

 Defendants maintain that being husband and wife they cannot be guilty of conspiracy. No Illinois court has passed upon this question in a criminal case. It was held in *Merrill v. Marshall*, 113 Ill. App. 447, and *Worthy v. Birk*, 224 Ill. App. 574, that the common-law rule still prevailed. These were civil cases. At common law a husband and wife, being regarded as one person, no prosecution for conspiracy between them could be maintained against them alone. *People*

*v. Miller,* 82 Cal. 107, 22 Pac. 934. But if they are joined with others there may be a conviction. *State v. Clark,* 9 Houst. (Del.) 536, 33 Atl. 310. The People state that it can no longer be said that a wife has no separate legal existence, and argue that since the reason for the common-law rule as to conspiracies has disappeared, the rule should not be followed. California adheres to the common-law rule. However, in *Johnson v. United States,* 157 F. (2d) 209, in an opinion by the Court of Appeals of the District of Columbia, the court said:

"No reason remains why the law should not recognize the obvious fact that the relation of husband and wife does not prevent two persons from conspiring to commit an offense. The interest of society in repressing crime requires that the fact be recognized, and our common-law system does not require that its recognition await express legislative action."

To the same effect is *Dalton v. People,* 68 Col. 44, 189 Pac. 37. In the view we take of the factual situation presented by the case at bar it is unnecessary for us to decide whether the common-law rule prevails in this State.

■ Defendants' point rests on the rule that where there are but two parties to a conspiracy, the acquittal of one of them requires the discharge of the other. See *People v. Cohn,* 358 Ill. 326; *People v. LaBow,* 282 Ill. 227; and *People v. Bryant,* 409 Ill. 467. In the latter case the Supreme Court said (469) that it has long been the law in this State that to constitute the crime of conspiracy there must be more than one person guilty thereof, and that before a defendant can be convicted of conspiracy the evidence in the cause on trial must show that there were two or more persons guilty of such conspiracy, citing *People v. Mader,* 313 Ill. 277, and *Evans v. People,* 90 Ill. 384. In *People v. Dewey,* 259 Ill. App. 330, the court said (334):

141

"The fact that the crime of conspiracy cannot be committed by one person does not prevent one person from being found guilty of such crime if the conspiracy charged is proven and that the one person tried participated therein. One person may be found guilty under an indictment charging him with having conspired with persons unknown to the grand jury. (*People v. Mather*, 4 Wend. [N. Y.] 229; *State v. Slutz*, 106 La. 182.) Even though all of the conspirators are known, each of them may be indicted and convicted separately. [Citing cases.] In such a case a judgment of conviction may be pronounced against one before the trial of the others. . . . The fact that one of two conspirators secures immunity by becoming a witness for the prosecution does not prevent the conviction of the other, even though there were no other persons in the conspiracy."

Assuming, without deciding, that by the common-law rule a prosecution for conspiracy between husband and wife cannot be maintained because they are one person, the question arises as to whether the rule is applicable to the facts of the instant case.

 The indictment charges that the Esteps, Abe Simon, Earl Edward Southard and Sadie Stafford unlawfully and wilfully combined, conspired, confederated and agreed together with each other, with Ethel C. Tarpey, Frank Handzik, Ethel Handzik, Lillian Meiers, Alma Meiers, Clara Mae Boyer, Amelia C. Scarlett "and with divers other persons whose names are unknown to the grand jurors," etc. The indictment charges the Esteps with conspiring with certain named persons and with other persons whose names are unknown. There was competent evidence that the Esteps conspired, as charged, with some of the named persons and with others whose names are unknown. Hence, the fact that the Esteps are husband and wife does not prevent their prosecution and conviction for con-

spiracy. The jury had the right to find the Esteps, considered as one person, guilty of conspiring with other named persons or with persons whose names are unknown. Abe Simon, who was granted a severance on the statement that the State's Attorney expected him to be a "state's witness" did not testify. Alma Meiers, Lillian Meiers, Clara Mae Boyer, Ethel C. Tarpey and Amelia C. Scarlett are not named as defendants in the indictment, but are named therein as co-conspirators, and testified for the People, while Frank Handzik, Esther Handzik and Anna C. Huber, also named as co-conspirators but not as defendants, testified for defendants. It is significant to note that the record in the case at bar has many similarities with the record in the case of *People v. Handzik*, 410 Ill. 295. There Mrs. Handzik was convicted of a violation of the Medical Practice Act, upon information filed in the county court of Cook county. The Supreme Court affirmed the judgment. The defendant therein claimed to be a psycho-physician and claimed to practice divine healing through prayer as a minister of her church, the Central Baptist Church of Chicago, which defendants in the instant case organized. Mrs. Handzik undertook to give relief to patients by the use of Estemeters, Vita-Ray machines and atomic water, as in the instant case. On the record before us the point that the Esteps, being husband and wife, cannot be guilty of conspiracy is not pertinent.

For the reasons stated, the judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*

FRIEND and NIEMEYER, JJ., concur.