Reverend W. Eugene **SCOTT, PhD.,**
**Plaintiff-Appellant,**

v.

Joel **ROSENBERG, et al.,**
**Defendants-Appellees.**

No. 81–5387.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 3, 1982.

Decided Jan. 21, 1983.

Rehearing Denied April 22, 1983.

---

Bruce Henderson, Henderson and Esser, Glendale, Cal., for plaintiff-appellant.

Peter R. Osinoff, Asst. U.S. Atty., Los Angeles, Cal., for defendants-appellees.

Before WALLACE, SCHROEDER and CANBY, Circuit Judges.

WALLACE, Circuit Judge:

Scott, the president and pastor of Faith Center Church (the church), brought this action for injunctive relief and for actual and punitive damages against five present and former officers and employees (the government employees) of the Federal Communications Commission (the FCC), alleging that they violated his first amendment rights during an investigation of the church's television and radio stations. The district court granted summary judgment for the government employees. We affirm.

## I

Diederich, a former employee of one of the church's television stations, sent a letter to the FCC in which he alleged that Scott had solicited during broadcasts and subsequently received funds for projects which were never undertaken. He also stated his belief that Scott was using the stations for his personal gain. In response to that letter, the FCC instituted an investigation of the church's California television and radio stations. The FCC conducted a number of interviews during which further allegations were made: that the stations had failed to log paid religious programming as commercial broadcasting, that Scott had misstated the amount of his personal remuneration during broadcast solicitations, and that Scott had made personal pledges during the broadcasts which he had never fulfilled.

Subsequently, two FCC employees made an unannounced visit to the television station located in the main church building to interview employees and investigate records. There is some dispute with respect to how clearly they identified the purpose of their visit and with respect to the scope of their request for access to church and station records. In any event, the church subsequently made available some, but not all, of the materials requested, and thereafter the FCC issued an order designating for hearing the station's application for license renewal and a notice of apparent liability for forfeiture for violation of 18 U.S.C. § 1343, the statute governing fraud by use of radio and television. The record does not indicate the status of the proceedings pertaining to that order. The church has apparently sought relief both before the FCC and in the courts. Those claims of the church, however, are not before us. Scott brought this action not in any representative capacity, but to vindicate his individual rights. He apparently does not, in his personal capacity, contest the FCC's request for station logs and for his salary records. He does, however, allege that the FCC's inquiry into his personal donations violates his free exercise rights under the first

amendment.[1] Scott's claim that his religion requires donations to be made confidentially if they are to be received by God as sacrifices is not disputed.

The questions presented by this appeal are whether Scott has standing to bring this action; whether Scott has a legal basis for his claim under 42 U.S.C. § 1983, under 42 U.S.C. § 1985(3) or directly under the first amendment; whether the FCC employees violated Scott's first amendment rights; and, if so, whether the FCC employees are entitled to immunity. Summary judgment was appropriate because there is no genuine issue as to any material fact.

## II

The government employees argue that Scott lacks standing to bring this action because the FCC investigation was directed towards the station and not Scott, and because the FCC requested only church records and none of Scott's personal records. We hold, however, that Scott has standing to assert his claim.

Article III of the Constitution limits the judicial power of the United States to the resolution of actual cases and controversies. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982) (*Valley Forge*). A part of this article III requirement is the doctrine of standing. *Id.* at 471, 102 S.Ct. at 758. The "gist of the question of standing" is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). At a minimum,

> Article III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976).

*Valley Forge, supra,* 454 U.S. at 471, 102 S.Ct. at 758 (footnote omitted); *see Larson v. Valente,* 456 U.S. 228, 238–43, 102 S.Ct. 1673, 1680–83, 72 L.Ed.2d 33 (1982) (church, as well as its individual followers, had standing under article III to challenge state law requiring religious organizations that received more than half their total contributions from nonmembers to register and report to the state).

But even meeting this article III threshold for standing may be insufficient to gain access to the federal court for redress of certain claims. The Court has also articulated several prudential requirements which limit the category of persons who may invoke the powers of the federal judiciary. When the plaintiff's "asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *accord Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216–27, 94 S.Ct. 2925, 2929–2930, 41 L.Ed.2d 706 (1974). In addition, the "Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin, supra,* 422 U.S. at 499, 95 S.Ct. at 2205; *Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943) (per curiam).[2] Under these pru-

---

**1.** Scott also claimed a deprivation of his fourth, fifth and ninth amendment rights, but cited no supporting authority. We find these claims frivolous.

**2.** There are certain other prudential limitations on standing which are applied in appropriate circumstances. *See, e.g., Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1925, n. 19, 48 L.Ed.2d 450

dential principles, the judiciary seeks "to limit access to the federal courts to those litigants best suited to assert . . . particular claim[s]" and "to avoid deciding questions of broad social import where no individual rights would be vindicated." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1607–1608, 60 L.Ed.2d 66 (1979).

■ We conclude that Scott meets the constitutional requirement for standing. The FCC requested church records of Scott's donations. Scott alleges that his religious beliefs require that his giving be secret if it is to be efficacious. The government employees do not deny that this is a tenet of Scott's faith. Scott, therefore, may properly allege injury from disclosure of his donations. If the FCC has already procured the requested records, the alleged injury may be actual. If the FCC has not yet received the documents, but continues to threaten the church with a loss of its license for failure to produce them, the alleged injury is at least threatened. Therefore, the injury aspect of article III standing is met.

■ The second constitutional standing requirement is that the injury be traceable to the government employees' action. Here, it is. The church has not and apparently will not release the records voluntarily. But for the FCC's actions, no injury or threat of injury could have occurred. The government employees argue that if they have interfered with any first amendment rights, they are the rights of the church, for no request has been made of Scott personally. Superficially, the argument is plausible, but the law is otherwise. When a governmental demand "imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not . . . deprive the person harmed of standing to vindicate his rights" if he can establish that "the asserted injury

was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Warth v. Seldin, supra,* 422 U.S. at 505, 95 S.Ct. at 2208; *see United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Roe v. Wade,* 410 U.S. 113, 124, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973).

■ The final requirement for article III standing is that a favorable decision would prevent or redress the injury. Scott alleges and we assume, *see* Part V, *infra,* that he may be entitled to damages if he has suffered a violation of his first amendment rights. Furthermore, if the action of the government employees threatens future violation of his first amendment rights, he is entitled to injunctive relief prohibiting their demands on the church for his donation records. A favorable decision would prevent or redress Scott's injury.

■ Scott therefore meets the constitutional requirements for standing. We turn now to the prudential requirements. His asserted harm is a particularized grievance, namely, the threatened or actual dissemination of his personal donation records, and he asserts his own legal rights and interests under the Constitution, not those of the church or of any third person. *See generally United States v. Raines,* 362 U.S. 17, 21–22, 80 S.Ct. 519, 522–523, 4 L.Ed.2d 524 (1960); *Barrows v. Jackson,* 346 U.S. 249, 256–57, 73 S.Ct. 1031, 1035–1036, 97 L.Ed. 1586 (1953); *Tileston v. Ullman, supra,* 318 U.S. at 46, 63 S.Ct. at 494. The mere fact that the records which have been or may be taken are church records does not mean that the intrusion could violate only the church's rights. *See NAACP v. Alabama,* 357 U.S. 449, 458–59, 78 S.Ct. 1163, 1169–1170, 2 L.Ed.2d 1488 (1958). Thus, Scott has standing in this case. We therefore turn to the merits of his claims.

### III

■ Shortly after the FCC initiated its investigation, the Attorney General of the

(1976) (the interest of the plaintiff must at least be " 'arguably within the zone of interests to be protected or regulated' by the statutory framework within which his claim arises," *quoting*

*Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).

State of California began an investigation of similar allegations pursuant to then-effective California law. Scott alleges that the government employees engaged in a series of telephone conversations and written communications with California officials, and thus participated in the state inquiry, including the state subpoena of church records, in violation of 42 U.S.C. § 1983. We assume for purposes of this appeal that federal employees, like private citizens, can act "under color of state law" and may be liable under section 1983 if they conspire with or participate in concert with state officials who, under color of state law, act to deprive a person of protected rights. *See Dombrowski v. Eastland,* 387 U.S. 82, 84, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967) (per curiam); *Kletschka v. Driver,* 411 F.2d 436, 448–49 (2d Cir.1969); *Peck v. United States,* 470 F.Supp. 1003, 1007 (S.D. N.Y.1979).

Nevertheless, even when properly viewed in the light most favorable to Scott, the materials submitted in support of and in opposition to the motion for summary judgment present no genuine issue of material fact which can assist him. At most, the government employees requested information from, offered to exchange, and did exchange information with the California attorney general's office by means of which the two agencies assisted one another. The government employees denied by affidavit that they either instigated the state investigation or requested that state investigators procure information for them. Scott produced no evidence to the contrary. Therefore, Scott has raised no genuine issue of material fact which might support his claim for relief under section 1983. *See Angel v. Seattle-First National Bank,* 653 F.2d 1293, 1299 (9th Cir.1981); *Marks v. United States,* 578 F.2d 261, 262–63 (9th Cir.1978).

The state investigation, including the state subpoena of church records, is the only state action alleged in the complaint. We conclude that the FCC officers were not "willful participant[s] in joint activity with the State or its agents," *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1156–1157, 16 L.Ed.2d 267 (1966) (construing 18

U.S.C. § 242), simply because they may have furnished some information which facilitated the state investigation. Any FCC request for and receipt of information gathered by the state officials in the course of their independent investigation did not constitute action under color of state law. It is true that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *Monroe v. Pape,* 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961) (*quoting United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)), *overruled on other grounds, Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But even if we assume that the state officials violated Scott's first amendment rights in the course of their investigation, the mere fact that they may have shared with the government employees information unlawfully procured does not mean that the government employees acted under color of state law. If the government employees requested information from the state in this case, they acted under power possessed by virtue of *federal* law. If they obtained that information, it was because they were clothed with the authority of *federal* law. This, without more, is not enough to establish that their conduct was under color of state law. *See District of Columbia v. Carter,* 409 U.S. 418, 424–25, 93 S.Ct. 602, 606–607, 34 L.Ed.2d 613 (1973).

IV

Scott also alleges that the government employees conspired with the California officials and with the church's ex-employees to deprive him of equal protection of the laws in violation of 42 U.S.C. § 1985(3). It may well be that a claim based upon a conspiracy to violate a protected right of religion could be stated pursuant to section 1985(3). *See Life Insurance Company of North America v. Reichardt,* 591 F.2d 499, 505 & n. 15 (9th Cir. 1979). In this case, however, Scott has stated no claim for relief under the statute.

In *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court held that section 1985(3) was not "intended to apply to all tortious, conspiratorial interferences with the rights of others." *Id.* at 101, 91 S.Ct. at 1798. Rather,

> [t]he language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

*Id.* at 102, 91 S.Ct. at 1798 (footnotes omitted, emphasis in original). Scott has alleged no class-based, invidiously discriminatory animus for the alleged conspiracy. He has not alleged that the government employees deprived him of his first amendment rights because of his church membership or because he is one of a group holding certain religious beliefs or that the FCC action was in any other way class-based. He has failed to allege any facts from which we might infer a class-based animus. We therefore conclude that he has failed to state a claim for relief under the statute. *See Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir.1980); *Life Insurance Company of North America v. Reichardt, supra,* 591 F.2d at 505; *Prochaska v. Fediaczko,* 473 F.Supp. 704, 709 (W.D.Pa.1979) (conspiracy directed only toward the individual exercise of first amendment rights does not state a cause of action under section 1985(3)).

## V

We must next decide whether Scott has a claim under the first amendment and, if so, what type of remedy is appropriate. We learned from the Supreme Court in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (*Bivens*), that a person whose fourth amendment rights have been violated by federal officers has a legal claim implied directly under the fourth amendment and is entitled to recover money damages for his injuries. The same right was extended to a claim arising from a violation of the fifth amendment in *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and to a claim arising from a violation of the eighth amendment in *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). The question before us is whether, as with the fourth, fifth, and eighth amendments, a claim also arises under the Constitution for violations of first amendment rights by federal officials.

Ordinarily, a right of action for damages against government officials is given birth by statutory mandate. *See Bivens, supra,* 403 U.S. at 427–30, 91 S.Ct. at 2020–2021 (Black, J., dissenting). The right of action judicially created in *Bivens* must accordingly be treated as an exception. That exception, however, is not limited to the fourth amendment. *See Davis v. Passman, supra,* 442 U.S. at 248, 99 S.Ct. at 2278. Indeed, the Court has expanded it to a principle of constitutional liability in very broad language:

> At least in the absence of "a textually demonstrable constitutional commitment of [an] issue to a coordinate political department," *Baker v. Carr,* 369 U.S. 186, 217 [82 S.Ct. 691, 710, 7 L.Ed.2d 663] (1962), we presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights.

*Id.* at 242, 99 S.Ct. at 2275.

While this analysis assists us with the disposition of this appeal, it is not necessary, as will soon be clear, for us to decide the ultimate issue of whether the first amendment provides a right of action. It is clear, however, that if first amendment rights are justiciable, then Scott is among "the class of litigants who allege that their

own constitutional rights have been violated." *Id.* There has been no suggestion by the government employees that Scott is not among those "who at the same time have no effective means other than the judiciary to enforce these rights." *Id.* We assume, without deciding, that a private cause of action may be implied directly under the Constitution for violations of the first amendment. *See Trapnell v. Riggsby,* 622 F.2d 290, 294 (7th Cir.1980); *Dellums v. Powell,* 566 F.2d 167, 194–95 (D.C.Cir.1977), *cert. denied,* 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978); *Paton v. La Prade,* 524 F.2d 862, 869–70 (3d Cir.1975).

Our next question is whether damages is an appropriate form of relief. In *Davis v. Passman,* the Court stated that "*Bivens . . .* holds that in appropriate circumstances a federal district court may provide relief in damages for the violation of constitutional rights if there are 'no special factors counselling hesitation in the absence of affirmative action by Congress.'" 442 U.S. at 245, 99 S.Ct. at 2277; *see Butz v. Economou,* 438 U.S. 478, 503–04, 98 S.Ct. 2894, 2909–2910, 57 L.Ed.2d 895 (1978). Holding that relief in damages was appropriate for violations of the due process clause of the fifth amendment, the Court identified the following policy factors as pertinent areas of inquiry: whether damages have been regarded historically as the ordinary remedy for the injury alleged, whether relief in damages would be judicially manageable, whether there are available alternative forms of judicial relief, whether evidence suggests that a damages remedy is contrary to the will of Congress, and whether such a remedy would open the courts to a deluge of claims. 442 U.S. at 245–48, 99 S.Ct. at 2277–2278.

Once more, however, it is unnecessary for us to decide whether these factors favor a damages remedy for violations of the free exercise clause by federal officials. We assume without holding that Scott is entitled to recover damages if his first amendment rights have been unjustifiably violated, *see Trapnell v. Riggsby, supra,* 622 F.2d at 294; *Dellums v. Powell, supra,* 566 F.2d at 194–95; *Paton v. La Prade, supra,* 524 F.2d at

869–70, and may be entitled to injunctive relief from a threat of a violation.

## VI

We must next examine the record to determine if there is any genuine factual dispute whether the government employees violated Scott's first amendment rights. Scott alleges that the government employees informed the press and public that they were investigating charges of fraud against Scott. He claims that those statements interfered with the free exercise of his religious obligation to convert others to his beliefs. He also argues that the FCC's demand, in conjunction with its investigation, that the church provide records of his personal pledges during 1976 and 1977, together with information showing the status of those pledges (paid, withdrawn, or outstanding) violates the free exercise clause of the first amendment.

In support of their motions for summary judgment, the government employees submitted affidavits in which they stated that they did not provide any information to the press or public with respect to the specific allegations made against the church. They further testified that they made no statements to the press or public accusing Scott of any criminal or dishonest activity. Scott introduced letters prepared by two of the government employees in response to public and congressional inquiries concerning the investigation. Those letters simply confirm that an investigation was in progress and that it was initiated in response to a complaint alleging irregular conduct. The letters further clarify the FCC's responsibility to investigate such complaints, including possible questions concerning the complainant's credibility. The letters do not, however, support Scott's allegations that the government employees dispatched charges of fraud to the press and public. Scott's allegations are unsupported by a factual presentation. Merely conclusory, they are insufficient to survive the government employees' motion for summary judgment. *Angel v. Seattle-First National Bank, su-*

*pra,* 653 F.2d at 1299; *Marks v. United States, supra,* 578 F.2d at 262–63.

Scott's second argument about the investigation of his pledges presents more difficult questions. It is complicated by the fact that the church owns the broadcast station. Our analysis must be on two levels: first, the result of the actions of the FCC in relation to the station and second, the result of its actions in relation to Scott.

 We start with the proposition that first amendment analysis may be different for broadcasters than for members of other types of media. A greater degree of conflict with traditional first amendment principles is tolerated with the broadcast media because of the limited number of available frequencies. *FCC v. Pacifica Foundation,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3039–3040, 57 L.Ed.2d 1073 (1978) ("[O]f all forms of communication, it is broadcasting that has received the most limited First Amendment protection."); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 383, 386–89, 89 S.Ct. 1794, 1803, 1804–1806, 23 L.Ed.2d 371 (1969) (broadcast frequencies are a "public trust"; "differences in the characteristics of [the broadcast] media justify differences in the First Amendment standards applied to them."); *see Buckley v. Valeo,* 424 U.S. 1, 49 n. 55, 96 S.Ct. 612, 649, n. 55, 46 L.Ed.2d 659 (1976) (per curiam) (distinguishing broadcast media cases from traditional free speech cases); *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 101, 93 S.Ct. 2080, 2085–2086, 36 L.Ed.2d 772 (1973) ("*Red Lion Broadcasting Co. v. FCC* makes clear that the broadcast media pose unique and special problems not present in the traditional free speech case.") (citation omitted); *cf. Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. at 375, 89 S.Ct. at 1798–1799 (fairness doctrine "enhance[s] rather than abridge[s] the freedoms of speech and press protected by the First Amendment"). The first question, therefore, is should the FCC be required to meet a different standard prior to investigation of broadcasters of religious programs than it is required to meet prior to investigation

of broadcasters of secular programs? More specifically, should the FCC be required to demonstrate a compelling governmental interest prior to investigating an allegation of fraud by one of its licensees that is owned by or affiliated with a religious organization? We hold that such a requirement is not necessary.

The Federal Communications Act authorizes the FCC to regulate as required by the "public convenience, interest, or necessity," 47 U.S.C. § 303, and does not differentiate types of broadcast licensees. The FCC grants licenses and regulates the public airwaves without differentiating between religious and secular broadcasters. *See, e.g., In re PTL of Heritage Village Church & Missionary Fellowship, Inc.,* 71 F.C.C.2d 324 (1979). In addition, courts have approved the application of FCC rules to religious groups on the same basis as applied to secular groups. *See Red Lion Broadcasting Co. v. FCC, supra* (fairness doctrine applied to broadcast of a religious program without distinguishing religious and secular broadcasting); *King's Garden, Inc. v. FCC,* 498 F.2d 51, 60 (D.C.Cir.1974) ("But, like any other group, a religious sect takes its franchise 'burdened by enforceable public obligations.' "), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); *accord Brandywine-Main Line Radio, Inc. v. FCC,* 473 F.2d 16 (D.C.Cir.1972), *cert. denied,* 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973); *Trinity Methodist Church v. Federal Radio Commission,* 62 F.2d 850 (D.C.Cir. 1932), *cert. denied,* 288 U.S. 599, 53 S.Ct. 317, 77 L.Ed. 975 (1933); Hardy & Secrest, *Religious Freedom and the Federal Communications Commission,* 16 Val.U.L.Rev. 57 (1981).

 Requiring the FCC to justify investigations undertaken in response to allegations of fraud by one of its licensees, religious or secular, is not supported by precedent, is impracticable, and might raise other first amendment obstacles. *See, e.g., Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 792–93, 93 S.Ct. 2955, 2975–2976, 37 L.Ed.2d 948 (1973) ("A proper respect for both the Free Exer-

cise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion."). Allowing such an investigation of a broadcast station, however, does not necessarily mean that the investigation may be open ended. During the investigation, free expression conflicts may arise. This brings us to the second level of our analysis which pertains to the acts of the FCC in relation to Scott. When a collision between portions of an FCC investigation and free exercise rights occurs, free exercise rights can be protected by requiring the FCC to demonstrate a compelling governmental interest. A compelling governmental interest must be shown at that point because an action taken in the course of an investigation directly conflicts with a sincerely held religious belief. *See generally EEOC v. Pacific Press Publishing Association,* 676 F.2d 1272 (9th Cir.1982) (government's compelling interest in ensuring equality in employment opportunity justified burden on exercise of religious publisher's policy prohibiting suits by members against the church).

Here, we conclude that it is necessary to employ compelling state interest analysis because of the unique factual setting. The FCC requested information, the release of which Scott alleges in and of itself violates his religious free exercise right. Thus, there is a direct conflict between a sincerely held religious belief and an action by government officials. As stated by the Fifth Circuit in examining employment policies at a religiously-affiliated college, "the relevant inquiry is not the impact of the [government action] upon the institution, but the impact of the [government action] upon the institution's exercise of its sincerely held religious beliefs." *EEOC v. Mississippi College,* 626 F.2d 477, 488 (5th Cir. 1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981).

Therefore, we conclude that we can affirm the district court's order granting summary judgment only if the FCC's demand for the records of Scott's donations does not infringe on his first amendment freedoms or, if it does, a compelling governmental interest justifies the demand. *Sherbert v.*

*Verner,* 374 U.S. 398, 406–07, 83 S.Ct. 1790, 1795–1796, 10 L.Ed.2d 965 (1963); *see Wisconsin v. Yoder,* 406 U.S. 205, 220–21, 92 S.Ct. 1526, 1535–1536, 32 L.Ed.2d 15 (1972). "[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Id.* at 215, 92 S.Ct. at 1533.

In support of his claim, Scott submitted personal affidavits in which he states that he believes that his church contributions are "sacrifices" and that disclosure of his sacrifices would violate their sacred nature. The government employees do not challenge the sincerity of Scott's beliefs. *See generally United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). Furthermore, Scott's claim is not "so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause." *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 715, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981) (*Thomas*). We therefore conclude that the FCC's demand interferes with Scott's first amendment rights.

The conclusion that there is conflict between Scott's beliefs and the demand imposed by the FCC is "only the beginning, however, and not the end of the inquiry. Not all burdens on religion are unconstitutional." *United States v. Lee,* 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982); *see Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The state may justify its infringement on religious liberty if it is necessary to accomplish an overriding governmental interest. *United States v. Lee, supra,* 455 U.S. at 257, 102 S.Ct. at 1055; *Thomas, supra,* 450 U.S. at 718, 101 S.Ct. at 1432; *Wisconsin v. Yoder, supra,* 406 U.S. at 215, 92 S.Ct. at 1533; *Sherbert v. Verner, supra,* 374 U.S. at 406, 83 S.Ct. at 1795; *see also EEOC v. Pacific Press Publishing Association, supra,* 676 F.2d at 1279 ("In determining whether a neutrally based statute

violates the free exercise clause, courts must weigh three factors: (1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling state interest ..., and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state."). We must therefore determine whether the governmental interest in preventing the fraudulent practices alleged is sufficiently compelling to justify the burden upon Scott's right to the free exercise of his religion and, if so, whether the demand for church records of Scott's pledges and donations was necessary to further that interest. Whether a governmental interest is or is not compelling is a question of law. *See United States v. Lee, supra,* 455 U.S. at 258–59, 102 S.Ct. at 1055–56; *Thomas, supra,* 450 U.S. at 718–19, 101 S.Ct. at 1432–1433.

■ The governmental interest in preventing some crimes is compelling, *see Prince v. Massachusetts, supra,* 321 U.S. at 166–67, 64 S.Ct. at 442–443, but that interest is not sufficient to permit interference with free exercise rights in every case. *See Wisconsin v. Yoder, supra,* 406 U.S. at 215, 92 S.Ct. at 1533. The Supreme Court has repeatedly stated that religious frauds can be penalized. *Cantwell v. Connecticut,* 310 U.S. 296, 306, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940) (dictum) ("Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct."); *Schneider v. State,* 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939) (dictum) ("fraudulent appeals may be made in the name of charity and religion ... [which] may be denounced as offenses and punished by law"); *see United States v. Ballard, supra,* 322 U.S. at 95, 64 S.Ct. at 890 (Jackson, J., dissenting) ("religious leaders may be convicted of fraud for making false representations on [some] matters ... as for example if one represents that funds are being used to construct a church when in fact they are being used for personal purposes"). Lower courts have applied this principle to reli-

gious organizations conducting fraudulent nonreligious activities, *see SEC v. World Radio Mission, Inc.,* 544 F.2d 535 (1st Cir. 1976), *disapproved on other grounds, Aaron v. SEC,* 446 U.S. 680, 687 n. 7, 100 S.Ct. 1945, 1950 n. 7, 64 L.Ed.2d 611 (1980), and to individuals soliciting money for pretended religious purposes when religious beliefs were not sincerely held, *see People v. Estep,* 346 Ill.App. 132, 104 N.E.2d 562, *writ dismissed,* 413 Ill. 437, 109 N.E.2d 762 (1952), *cert. denied,* 345 U.S. 970, 73 S.Ct. 1112, 97 L.Ed. 1387 (1953); *People v. Le Grande,* 309 N.Y. 420, 131 N.E.2d 712 (1956), and have concluded that the protections of the first amendment were not applicable.

■ Here, however, we face the question whether, when an allegedly fraudulent activity is connected with the exercise of sincerely held religious beliefs, the governmental interest in preventing fraud overrides the individual's right of religious freedom. We conclude that the answer depends, at least in part, on the nature of the fraud. We recognize that the protections of the free exercise clause do not "turn upon a judicial perception of the particular belief or practice in question .... Courts are not arbiters of scriptural interpretation." *Thomas, supra,* 450 U.S. at 714, 716, 101 S.Ct. at 1430–1431; *cf. United States v. Ballard, supra* (courts may inquire into sincerity, but not truth or falsity, of religious tenets). This case does not involve only an allegation that Scott made certain pledges during his broadcast, but failed to pay them. The FCC investigation centered on allegations that Scott had solicited funds for certain specific projects which had never been undertaken. The government has a compelling interest in preventing the diversion of funds contributed for specific, identified purposes especially when such funds are obtained through the use of the public airwaves. *See id.* at 95, 64 S.Ct. at 890 (Jackson, J., dissenting). Scott claims that in the framework of his religion, it is only important that the contributor give and, having made the gift, the contributor is spiritually blessed, no matter how his donation is used. Scott further states that he

must follow "the leanings of the Lord" with respect to the utilization of donations. Scott does not claim, however, that contributors to identified projects know that their contributions may be used for any purpose which Scott determines to be in accordance with the will of the Lord. Scott does not claim that he clarified this aspect of his religious practice in his broadcast solicitations. At least under these limited circumstances, we conclude that the government has a compelling interest in preventing the diversion of funds from the specifically identified projects for which they have been solicited.

▆▆▆ Our final inquiry is whether the government's investigation of Scott's pledge and donation records was necessary to further this compelling interest. We need not determine whether any other aspects of the FCC investigation were justifiable, for Scott contests only the FCC demand for those records. Although not every allegation of fraudulent solicitation would justify the government's interference with the religious practices of individuals and churches, we conclude that the allegations here justified the FCC's narrow and limited inquiry into Scott's donation records.

Several important considerations support this conclusion. First, we believe that the context in which the pledges were made is significant. When Scott and the church decided to acquire television and radio stations, they availed themselves of facilities which, under congressional mandate, must be operated in the public interest. 47 U.S.C. §§ 307(a), 309(a). With respect to the operation of broadcast facilities, the Supreme Court has held that the right of viewers and listeners, not that of broadcasters, is paramount. *Columbia Broadcasting System, Inc. v. Democratic National Committee, supra,* 412 U.S. at 102, 93 S.Ct. at 2086, *citing Red Lion Broadcasting Co. v. FCC, supra,* 395 U.S. at 390, 89 S.Ct. at 1806–1807; *see also Writers Guild of America, West, Inc. v. American Broadcasting Co.,* 609 F.2d 355, 362 (9th Cir.1979), *cert. denied,* 449 U.S. 824, 101 S.Ct. 85, 66

L.Ed.2d 27 (1980). An allegation of fraud, even if not sufficiently specific or reliable generally to justify inquiry into solicitations made by a congregation in church, may nevertheless be sufficient to justify inquiry into broadcast solicitations.

Second, the FCC investigation in this case was premised on information sufficiently reliable to justify the limited intrusion on first amendment rights which it engendered. The FCC began its inquiry only after it received a complaint signed by Diederich, a former employee of the television station. In his former employment, Diederich was in a position in which he was likely to have received personal knowledge of the irregularities he alleged. His signed complaint, if knowingly false, could expose him to liability in tort for malicious prosecution, *see, e.g., Morfessis v. Baum,* 281 F.2d 938, 940 (D.C.Cir.1960); *Hardy v. Vial,* 48 Cal.2d 577, 580–81, 311 P.2d 494, 496–97 (1957); *Dixie Broadcasting Corp. v. Rivers,* 209 Ga. 98, 70 S.E.2d 734 (1952) (action before FCC), and was therefore entitled to a greater inference of reliability than an unsigned statement would have been. Furthermore, before they sought to inspect church records, the government employees conducted several interviews in which they received information to support Diederich's allegations. Certainly, governmental agencies must be wary of complaints which cannot be investigated without interfering with first amendment rights. Malicious or unsubstantiated allegations could easily be used to harass unpopular religions and their leaders. We are satisfied, however, that the information upon which the FCC acted was sufficiently reliable to justify its investigation.

Third, the investigation in this case was narrow and avoided any unnecessary interference with the free exercise of religion. We can imagine circumstances in which the interference with religion could be substantial enough to overbalance a governmental interest that otherwise would be compelling, but that is not this situation. There was no request for wholesale investigation of the church's financial records, but rather

specific requests for records of an FCC licensee concerning Scott's salary and donations, both of which he allegedly misrepresented during broadcast solicitations. The added request, not challenged here, for access to the video tapes of broadcast solicitations and church records detailing the receipt and expenditure of publicly solicited funds also demonstrates the limited focus of the investigation.

Finally, the FCC's demand for access to Scott's donation records was necessary to serve its compelling interest in investigating the alleged diversion of funds. If, as alleged, Scott solicited funds for projects which were never undertaken or if funds contributed to those projects were illegally diverted to other uses, Scott's misrepresentation of his personal pledges may have been intended to induce those contributions and therefore could constitute part of a scheme to defraud. Although other information might be only tangentially relevant to the objectives of a legitimate inquiry, the nexus between the investigations and the FCC's objective in this case was sufficiently close to comply with the principle that valid restrictions on first amendment rights must embody the least restrictive means of effectuating the government's compelling interest. *See Thomas, supra,* 450 U.S. at 718, 101 S.Ct. at 1432; *Sherbert v. Verner, supra,* 374 U.S. at 407, 83 S.Ct. at 1795–1796, *citing Shelton v. Tucker,* 364 U.S. 479, 487–90, 81 S.Ct. 247, 251–253, 5 L.Ed.2d 231 (1960). *See generally United States v. Lee, supra,* 455 U.S. at 258, 102 S.Ct. at 1056 ("Religious beliefs can be accommodated, but there is a point at which accommodation would 'radically restrict the operating latitude of the legislature.'", *quoting Braunfeld v. Brown,* 366 U.S. 599, 606, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563 (1961)) (citation omitted).

## VII

Scott also claims that the actions of the government employees violated the establishment clause of the first amendment. He apparently believes that inquiry into his donation record is only the first step in a contemplated program of pervasive regulation. The government employees have submitted affidavits in which they state that their inquiries were for the purpose of ascertaining the truth of Diederich's allegations and determining whether renewal of the church's license was in the public interest. Scott has alleged no facts from which we can infer that pervasive regulation is either planned or threatened. The government employees were therefore entitled to summary judgment on the establishment claim. *Angel v. Seattle-First National Bank, supra,* 653 F.2d at 1299; *Marks v. United States, supra,* 578 F.2d at 262–63.

We hold that the government employees have not unjustifiably violated Scott's first amendment rights, and therefore do not reach the question of immunity. *See generally Butz v. Economou, supra* (absolute and qualified immunity); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (qualified immunity).

AFFIRMED.