**YAKIMA INDIAN NATION, Plaintiff,**

v.

**WHITESIDE, et al., Defendants.**

**No. C–83–604 JLQ.**

United States District Court,
E.D. Washington.

Sept. 11, 1985.

James B. Hovis, Hovis, Cockrill, Weaver & Bjur, Yakima, Wash., for plaintiff.

Jeffrey C. Sullivan, Pros. Atty., Yakima County, Yakima, Wash., for defendants Whiteside, Tollefson, Klarich and Anderwald.

Patrick Andreotti, Flower & Andreotti, Yakima, Wash., for defendant Brendale.

John K. Johnson, Brooks & Larson, Yakima, Wash., for amicus curiae Stanley L. Wilkinson.

## MEMORANDUM OPINION

QUACKENBUSH, District Judge.

The Yakima Indian Nation (Yakima Nation) brought this suit seeking a declarato-

ry judgment and injunction barring the defendants from taking or permitting any land use within the "Closed Area" which is contrary to the Amended Zoning Regulations of the Yakima Nation (Yakima Nation Code). The named defendants are the Yakima County Commissioners, the Director of Yakima County Planning Department, and Philip Brendale, record owner of fee land within the exterior boundaries of the Yakima Indian Reservation (Reservation).[1] Specifically, the plaintiff seeks to impose its zoning and land use law on a development proposed by defendant Brendale within the so-called "Closed" area of the Reservation. Additionally, the Yakima Nation asks the court to limit Yakima County's regulatory authority over this property to the extent that the County's laws would allow land uses inconsistent with those permitted by the plaintiff. In other words, the plaintiff seeks a judicial declaration that its regulatory jurisdiction over Brendale's property is paramount and exclusive.

The plaintiff's complaint also contains allegations of civil rights deprivations. More particularly, the Yakima Nation contends that the County's assertion of its zoning jurisdiction over the Brendale property violated Section 1 of the Civil Rights Act of 1871. (Codified at 42 U.S.C. § 1983).

The court has previously entered both a Temporary Restraining Order and a Preliminary Injunction which restrained defendant Brendale from changing the land use of the subject property (Ct.Rec. 12, 42). Thereafter, a four day trial was held and at its conclusion the court entered an oral decision favorable to the plaintiff.[2] (Ct. Rec. 128). What follows is the court's written opinion including its Findings of Fact and Conclusions of Law. This written opinion shall supplement the court's oral opinion.

## FACTUAL BACKGROUND

The Yakima Indian Nation is a composite of fourteen (14) originally distinct Indian tribes who banded together in the mid-1900's for the purpose of negotiating with the United States. Pursuant to a treaty signed in 1855 and ratified in 1869, 12 Stat. 951, these various tribes ceded vast areas of land but also reserved an area for their "exclusive use and benefit". This reserved area is the Yakima Nation Indian Reservation (Reservation).

The Reservation is located in southeastern Washington. It's exterior boundary encompasses approximately 1.3 million acres of land. Of this amount, about eighty percent of the land is held in trust by the United States for the benefit of the Tribe or its individual members (trust lands). The remaining land is held in fee by Indians or non-Indian owners (fee land). The majority of this fee land lies within the three incorporated towns in the northeastern part of the reservation—Toppenish, Wapato and Harrah. The remainder is scattered throughout the reservation creating the now familiar "checkerboard" effect. The fee lands fall within the boundaries of Klickitat, Lewis and Yakima Counties.

Most of the trust land lies within the Reservation's "Closed Area". This area occupies essentially the western two-thirds of the Reservation. It covers approximately 807,000 acres, 740,000 of which fall within Yakima County. Of this latter figure, 25,000 acres are fee land. The Closed Area is predominately forested (about two-thirds), the balance being classified as range land. The topography of this area varies from the gently sloping range land along its eastern edge, to deep river valleys in the central part and finally to the mountain peaks of the Cascade Range along its western boundary. A state-maintained highway, U.S. 97, cuts across the south-

---

1. In addition to those defendants, the complaint also named Frank Glaspey, co-developer of the proposed Brendale property development. By court Order dated February 10, 1984, defendant Glaspey was dismissed with prejudice. (Ct.Rec. 127).

2. The court's oral decision encompassed only the plaintiff's request for a declaratory judgment on the regulatory jurisdiction issue. The Yakima Nation's Section 1983 claim was expressly excluded from the oral decision but is addressed in this written opinion.

eastern portion of the area and several Bureau of Indian Affairs (BIA) maintained arterials provide access to the closed area's interior.

Apart from the "exclusive use and benefit" language in the treaty, it is unclear when the "Closed Area" was officially declared off-limits to the general public. It is undisputed that by Tribal Resolution dated August 11, 1954, the area was declared "to remain closed to the general public" to "protect the [Closed Area's] grazing, forest and wildlife resources." Entry into the area was restricted to enrolled members of the Yakima Tribe, official employees, permittees and persons with bona fide business and property interests. Access to the area was further limited when, in May 1972, the BIA restricted the use of the federally maintained roads within the Closed Area to Tribal members and permittees who were either record land owners or associated with the Yakima Nation through employment, business, or in some way directly benefitting the Yakima Nation.[3]

The Yakima Nation currently has a Courtesy Permit System which has expanded the original categories of permittees to include spouses and dependents of enrolled members, plus special groups or dignitaries visiting the reservation. For the stated purpose of the "protection and enhancement of its [Closed Area] natural resources, natural foods, medicines, game wildlife, [and] environment ..." the permitted uses are limited to sightseeing, hiking, camping and tribal, BIA, or family related business or activity. Permittees (*i.e.* nontribal members) are specifically prohibited from hunting, fishing, boating, drinking, operating vehicles off established roads, camping at other than designated campsites and removing flora, fauna, petrified wood, other valuable rocks or minerals or artifacts. Ingress and egress is monitored and controlled by four tribally-operated guard stations. Tribal police and game officers patrol the interior of the area.

*Tribal Land Use Regulations:*

In October 1970 the Yakima Nation instituted its first Zoning Ordinance. That ordinance was a six-page Tribal Resolution modeled after a similar Yakima County ordinance. The Zoning Ordinance designated all areas within the exterior boundaries of the reservation, both trust and fee lands (except the incorporated cities and towns) as being within the General Use District. All otherwise lawful uses were generally permitted except certain activities requiring a conditional use permit. *E.g.*, asphalt mixing plants, junk yards, certain feedlots, above ground storage tanks, etc. The Board of Adjustment, composed of all the members of the Tribal Council, sat as the Board of Appeals from administrative decisions and the Hearing Board for conditional use applications. Its decisions were the final tribal action.

In May 1972, the Yakima Nation adopted a new zoning law, the Amended Zoning Ordinance, which remains in effect today. Like its predecessor, the Amended Zoning Ordinance expressly is made applicable to fee land. Besides that similarity, this twenty-seven page document resembles the original ordinance only in the composition of the Board of Adjustments and its function. Otherwise, it is much more detailed and comprehensive. Among other things, it establishes a requirement for building permits, minimum lot sizes, authorizes the establishment of Planned Development Districts, provides for Special Use Permits and creates five categories of Use Districts. These Use Districts are: Agricultural, Residential, Commercial, Industrial, and Reservation Restricted Area.

The Reservation Restricted Area is another term for the Closed Area. It was established as a "special use district" to insure continuation of the Tribal natural

---

**3.** Defendant Brendale judicially challenged this closure on equal protection grounds but the court concluded no violation occurred. *United States v. Philip Brendale, et ux.*, C–74–197 (E.D. Wash. Aug. 27, 1974) (memorandum decision).

In a later action, however, Mr. Brendale was granted an easement by necessity. *Brendale v. Olney, et al.*, C–78–145 (E.D.Wash. Mar. 2, 1981) (memorandum decision).

resources and to insure the Treaty right of tribal members to have an area in which they can camp, hunt, fish, and gather roots and berries in the tradition of their culture. Within this district only the following uses are permitted:

1. Harvesting wild crops;
2. Grazing, timber production or open field crops;
3. Hunting or fishing by Tribal members;
4. Camping in temporary structures;
5. Tribal camps for the education and recreation of tribal members;
6. Construction and occupancy of buildings and structures constructed by the Yakima Nation or the Bureau of Indian Affairs to be used in the furtherance of tribal resources;
7. No building or other permanent structure or any appurtenances thereto other than those allowed in Sections 1–6 above shall be allowed in this district;
8. Any structure which is authorized in Sections 1–6 above shall be set back 200 feet from any waterway.

These limited uses are the primary source of the present action.

*Yakima County Land Use Regulations:*

As early as 1946 the County of Yakima regulated land use within its boundaries. This regulation was, however, not extensive until 1965 when the county adopted its first zoning ordinance which, as stated previously, was the model for the Yakima Nation's initial zoning ordinance.

The present comprehensive zoning regulations, The Yakima County Code, was first enacted in 1972. It was struck down for a procedural defect, but readopted in its same form in October, 1974. Within its seventy-two pages, the Yakima County Code identifies numerous specified use districts which generally regulate agricultural, residential, commercial, industrial, and forest-watershed uses. In the reservation area, the official county zoning map segregates the fee lands from the trust lands. The county does not apply its zoning law to trust lands.

The fee lands within the Closed Area are zoned "forest watershed". This designation allows a diversity of uses including, for example, single family dwellings; commercial camp grounds; overnight lodging facilities having less than sixteen (16) units; restaurants; bars; general stores; souvenir shops; service stations; marinas; saw mills and the construction of dams for the production of electricity. The minimum lot size for this use district is one-half acre, but the average size of any subdivision or short plat must be two acres. The stated purpose for the Forest-Watershed District is to facilitate land and water conservation while accommodating residential, recreational and commercial uses.

In addition to its comprehensive zoning regulations, Yakima County has other land use regulations applicable to fee land within the county. Its 1974 Subdivision Ordinance imposes standards for streets, water, sewage, drainage, parks and recreation areas, and school sites. The Yakima County Shoreline Master Program, adopted in 1974 as mandated by state law, regulates certain activities adjacent to shorelines. Also, as a participant in the federal flood insurance program the county attempts to control flood plain development, although it is not clear whether any Closed Area fee lands lie within an identified flood plain. Another of Yakima County's state-mandated land use regulations is its Environmental Ordinance which requires a review of the potential environmental impact of all non-exempt land use actions. None of the above-described regulations have been applied to trust lands on the Yakima Nation Reservation.

*The Brendale Property:*

Defendant Brendale owns a 160 acre tract of fee land approximately in the center of the forested portion of the Closed Area.[4] The 160 acre parcel was originally

---

**4.** Although Philip Brendale is partially of Indian blood, he is not a member of the Yakima Nation

as his blood quantum apparently is not suffi-

allotted to Brendale's great aunt, a member of the Yakima Nation, and later inherited by Brendale's mother and grandfather who were issued a fee patent in 1963. At his mother's death in 1972, the fee parcel passed to Philip Brendale.

In January 1982, Philip Brendale filed four contiguous short plat applications with the Yakima County Planning Department. In compliance with the Environmental Ordinance, Mr. Brendale submitted an Environmental Checklist from which the planning department could assess the potential impact of his proposed development and decide whether an Environmental Impact Statement (EIS) was warranted. Having determined that the short platting did not require an EIS because it would not significantly affect the environment, the planning department issued a "Declaration of Non-Significance". Thereafter, the department notified interested parties, including the Yakima Nation, of its determination and requested comments. At the end of the comment period, during which no reply from the Yakima Nation was received, the short plats were approved.[5]

Approximately one year later, in April 1983, Mr. Brendale submitted a long plat application to divide one of his newly platted twenty-acre parcels into ten two-acre lots. He indicated the lots were to be sold as summer cabin sites, with each site providing its own sewage treatment systems and water supply. After a review of the submitted Environmental Checklist, the County Planning Department issued a Declaration of Non-Significance, thus negating the necessity for an EIS.

Thereafter, the Yakima Nation timely appealed that Declaration of Non-Significance to the Yakima County Board of Commissioners. The grounds for the appeal were two-fold: (1) that Yakima County was without authority to regulate the land use of the Brendale property and (2) that the proposed Brendale development would significantly affect the environment and therefore an EIS was required. Hearings on the Tribe's appeal were conducted by the County Commissioners on August 1, 2, 8 and 9, 1983. During the early states of the hearings, the Yakima Nation strenuously argued the regulatory jurisdictional issue but, based upon advice from the county legal department, the Commissioners concluded that the appeal was properly before the Board and limited the appellants to presenting evidence as to the EIS issue only. Following hearing testimony from county and tribal witnesses, the Commissioners reversed the decision of the County Planning Department and ordered the preparation of an EIS. The county was in the early stages of preparing an EIS when the present action was initiated by the Yakima Nation.

In addition to the factual background as set forth above, the court makes the following specific factual findings:

## FINDINGS OF FACT

1. The proposed Brendale subdivision concerns the following described real property situated in Yakima County, Washington:

The Northwest Quarter and Southwest Quarter of the Southwest Quarter of the Northwest Quarter of Section 14, Township 8 North, Range 14 East, W.M.

The property is located approximately 25 miles Southwest of the community of White Swan and is northwest of the Intersection of Tepee Creek and IXL roads.

2. The proposed subdivision is fee patent land located within the exterior boundaries of the Yakima Indian Reservation. The property is within the "Closed Area"

cient to entitle him to enrolled status in the Yakima Nation.

5. Following the approval of the short plats, Mr. Brendale and the Yakima Nation exchanged offers and counteroffers for the sale of his property. Unfortunately, they were unable to agree on a price as the Tribe valued the property in light

of the development restrictions imposed on property within the Closed Area by the Yakima Nation zoning regulations and Mr. Brendale valued the property based upon its recreational development potential as permitted by the zoning regulations of Yakima County.

of the reservation which is accessible only by members of the Yakima Indian Nation and non-members holding permits from the Tribe or the Bureau of Indian Affairs.

3. The Closed Area covers approximately 807,000 acres, 740,000 of which falls within Yakima County. Of the latter figure, 25,000 acres (or 3.3%) is fee land. The St. Regis Paper Company owns approximately 18,000 of this fee land. The remaining 7,000 fee acres are owned by Indians and non-Indians.

4. The proposed subdivision covers an area of 20 acres and includes ten two-acre lots. The development contemplates the placement of recreational summer cabins and/or travel trailers on the lots.

5. Each lot within the proposed subdivision is to be served by an individual well and an on-site sewage disposal system consisting of a septic tank with drain field or a holding vault. Electricity is to be provided by private generators.

6. The only road access to the proposed subdivision is via Bureau of Indian Affairs roads. The nearest county road is over 20 miles from the project.

Interior access to the lots would be provided by private roads consisting of regraded existing logging spur roads or newly constructed roads. The roads would be dirt surfaced and would be maintained by a homeowner's association.

7. The proposed 20 acre subdivision is within a 160 acre quarter section owned by Phillip Brendale, the Northwest Quarter of Section 14, Township 8 North, Range 14 East, W.M. The proposed plat is bordered on the East and North by other lands within the quarter section owned by Mr. Brendale. It is bordered on the South by lands owned in fee by the St. Regis Paper Company and on the West by lands held in trust by the United States.

The quarter section owned by Mr. Brendale is bordered on the South and East by lands owned in fee by the St. Regis Paper Company and on the North and West by lands held in trust by the United States.

8. The subject property and all surrounding lands are forested.

9. There are currently no structures located on the subject property or on the quarter section parcel owned by Mr. Brendale.

10. The current land uses of the surrounding property include hunting and fishing, food gathering, herb gathering (for medicinal and spiritual purposes), timber production and wildlife habitat.

11. The subject property and all surrounding properties are within the Reservation Restricted Area (Closed Area) use district pursuant to the Yakima Indian Nation Zoning Ordinance. The purpose of the Reservation Restricted Area is to "insure continuation of the tribal natural resources and to insure the treaty right of tribal members to have an area in which they may camp, hunt, fish and gather roots and berries in the tradition of their culture". Within the Reservation Restricted Area no private buildings are permitted to be constructed.

12. Road construction and cabin site preparation will cause disruptions, displacements, compactions and/or covering of soil and will change ground surface relief features.

13. The proposal will cause a deterioration of ambient air quality due to vehicle exhaust emissions, dust raised on the interior and exterior access roads, and smoke from individual fireplaces or fires.

14. The proposed cabins and private roads will cause changes in absorption rates and drainage patterns. The proposal may cause deterioration of surface water quality due to runoff from disturbed sites. The proposal may alter the direction or rate of flow of ground water and may change the quantity of ground waters by direct withdrawal from wells. The proposal may cause the deterioration of ground waters through seepage from waste water, garbage and sewer facilities.

15. The proposal will result in the destruction of some trees and natural vegetation due to cabin and road construction.

The proposal may result in the introduction of new species of flora into the area through gardens or through inadvertent introduction such as weeds brought in with hay.

16. The proposal will result in the deterioration of existing wildlife habitat due to runoff, road and cabin construction, and the introduction of domestic pets. The proposal is likely to cause a change in the movement patterns of wildlife such as deer and elk due to the subject property's proximity to a wildlife migration corridor.

17. The proposal may result in the increase in the rate of use of fuel wood.

18. The proposal will increase existing noise levels due to human activity, vehicles, and generators.

19. The proposal will produce new light due to the artificial lights associated with human occupancy.

20. The proposal will result in the alteration of the present land use of the area. The proposal is a complete change from the current use of the subject property and adjoining properties. Further, the developer indicates there will probably be future development of lands he owns to the East and North of the subject property.

21. The proposal will alter the location, distribution and density of human population in the area. The Closed Area is uninhabited except for short term or seasonal use.

22. The proposal will result in the generation of additional vehicular movement due to increased traffic on the interior and exterior access roads.

23. The proposal will result in the need for new or altered governmental services in the areas of police and fire protection. The increased fire hazard caused by human occupancy potentially endangers the surrounding forest lands, wildlife, wildlife habitat, water quality, and cultural and historical sites.

24. The location of cabins on the property will inevitably lead to the need for increased police protection to prevent vandalism and to protect residents.

25. The proposal will result in the need for new systems for water, sewage and solid waste disposal.

26. The timber harvested form the restricted lands within the Closed Area is a major source of income for the Yakima Nation. Approximately 90 percent of the annual Tribal income is derived from the timber harvest.

27. The Closed Area is an integral part of the traditional Washat religion practiced by many tribal members in that it provides a unique place to gather foods and herbs.

28. "Sweathouses" and other places or items of cultural or religious significance are located within the Closed Area. At least one traditionally used "sweathouse" location lies within one to two miles of the subject Brendale property.

29. The Yakima Nation is in the process of expending considerable time and money to develop an extensive big game management program within the Closed Area. Field studies are presently underway which preliminarily show that elk herds migrate through the Tepee Creek drainage basin—the location of the Brendale proposed development.

30. A major elk wintering range lies three to five miles from the Brendale property.

31. Mule deer also use the area in the vicinity of the Brendale property as a migration corridor.

32. There are no permanent residences in the Yakima County portion of the Closed Area.

33. The Closed Area of the Yakima Nation is a unique area. It has remained relatively undeveloped. Over the years its forest has provided considerable economic benefits to the tribe; its waters, wildlife, and soil have provided an abundance of food and its protected existence has kept intact the Closed Area's intangible but critical cultural values.

34. The preponderance of the evidence has convinced this court that the Closed Area is an integral part of the Yakima

Indian Nation. As such, the Tribe must be able to exercise regulatory control over the area, including the Brendale fee land. To deprive the Yakima Nation of this authority would unquestionably threaten its political integrity, its economic security and the general health and welfare of the tribe and its members.

35. Yakima County's interest in regulating the Brendale property is limited; the only interest articulated by the county was the general interest of providing regulatory functions to its taxpaying citizens. Yakima County does not contend otherwise and the court finds that the Tribe's exercise of its regulatory authority over the fee land will not have effects outside the boundaries of the reservation. In no significant way will the Tribe's regulation of Mr. Brendale's property negatively affect defendant Yakima County.

## LEGAL ANALYSIS

The court's legal analysis must focus on two issues: the regulatory jurisdiction question; and, the Yakima Nation's Section 1983 claim.

## A. JURISDICTION TO REGULATE LAND USE:

The resolution of the jurisdictional dispute requires a two-step analysis. The court must first decide whether the Yakima Nation has any authority to regulate the activities of Mr. Brendale on his Closed Area fee land. If the tribe does indeed have that power, then the inquiry is whether Yakima County may exercise its concurrent jurisdiction over the same property. Although the two steps are distinct, there is some overlap in the analytical framework.

### 1. TRIBAL AUTHORITY: The Montana Test.

Although Indian Tribes possess "attributes of sovereignty over both their members and their territory", *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978), the dependent status of tribes and their diminished status

as sovereigns limits their power in relations between a Tribe and nonmembers of the Tribe. *Id.* at 326, 98 S.Ct. at 1087. In fact, Indian Tribes have been divested of the power to exercise any criminal jurisdiction over non-Indians. *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). Similarly, a Tribe's inherent power to exert civil jurisdiction over non-Indians has been diminished. While a Tribe does possess the power to "exclude nonmembers entirely or to condition their presence on the reservation", *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S.Ct. 2378, 2385, 76 L.Ed.2d 611 (1983), apparently that power may be exercised over non-Indian fee lands only in limited circumstances. *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Thus, in certain situations a Tribe may "exercise some forms of civil jurisdiction over non-Indians on their reservation, even on non-Indian fee lands." *Id.* at 565, 101 S.Ct. at 1258. Unfortunately, the parameters of that power are anything but settled; nevertheless, the Court has provided guidance which is pertinent to the case at hand.

The *Montana* Court identified two situations in which the exercise of tribal civil jurisdiction over non-Indian fee land may be appropriate. The first instance is where a non-Indian, through a business relationship or otherwise, has entered into a "consensual relationship" with the tribe or its members. *Id.* at 565, 101 S.Ct. at 1258. Such is not the case here as there is no evidence of any "consensual relationship" between the Yakima Nation and Brendale which would place him within the authority of the Tribe.

The second situation described by the *Montana* Court is where the non-Indian's conduct "threatens or has some direct effect on the political integrity, the economic security or the health or welfare of the tribe." *Id.* at 566, 101 S.Ct. at 1258. Thus, absent a "consensual relationship", the critical factual determination which must be made in deciding whether a Tribe may regulate the land use of a non-Indian on fee

land is whether the non-Indian's activities pose a threat to the Tribe's political integrity, its economic security or its health and welfare. *Id.* at 565–66, 101 S.Ct. at 1258–59; *see United States v. Anderson*, 736 F.2d 1358 (9th Cir.1984) (tribe lacked power to regulate water use of non-Indian fee landowners within the reservation); *Cardin v. De La Cruz*, 671 F.2d 363 (9th Cir.1982) (building, health and safety regulations applied to nonmember business located on fee lands within the reservation), *cert. denied*, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982); *Knight v. Shoshone & Arapahoe Indian Tribes*, 670 F.2d 900 (10th Cir.1982) (tribal zoning ordinance applied to fee land within the reservation); *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir.1981) (tribe allowed to exercise regulatory authority over water use of Non-Indian fee landowners within the reservation), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981); *Sechrist v. Quinault Indian Nation*, 9 I.L.R. 3064 (W.D.Wash.1982); *Lummi Indian Tribes v. Hallover*, 9 I.L.R. 3025 (W.D.Wash.1982).

■ As stated in the Findings of Fact, this court finds that Brendale's proposed development does indeed pose a threat to the political integrity, the economic security and the health and welfare of the Yakima Nation. His planned development of recreational housing places critical assets of the Closed Area in jeopardy. While the danger to the economically important timber production is significant, of paramount concern to this court is the threat to the Closed Area's cultural and spiritual values. To allow development in this unique and undeveloped area would drastically diminish those intangible values. That in turn would undoubtedly negatively affect the general health and welfare of the Yakima Nation and its members. This court must conclude therefore that the Yakima Nation may regulate the use that Brendale makes of his fee land within the Reservation's Closed Area.

■ Notwithstanding the court's finding that the proposed Brendale development's threatened harm allows the Yakima Nation to exercise civil regulatory authority, the defendants argue that Congress has stripped the Tribe of any such power. Specifically, the defendants contend that when the State of Washington assumed jurisdiction over the Yakima Reservation pursuant to § 6 of the Act of August 15, 1953, 67 Stat. 588, 590 (Public Law 280) (hereinafter P.L. 280) the Yakima Nation was divested of its inherent tribal authority to regulate the activities of non-Indians on deeded land.[6] The gist of their argument is that P.L. 280 was a *grant* of jurisdiction to the state (and therefore the county) which necessarily must have *withdrawn* jurisdiction

---

6. WASH.REV.CODE § 37.12.010 provides:
   Assumption of criminal and civil jurisdiction by state. The State of Washington hereby obligates and binds itself to assume criminal and civil jurisdiction over Indians and Indian territory, reservations, country, and lands within this state in accordance with the consent of the United States given by the act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session), but such assumption of jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States, unless the provisions of R.C.W. 37.12.021 [tribal consent] have been invoked, except for the following:
   (1) Compulsory school attendance;
   (2) Public assistance;
   (3) Domestic relations;
   (4) Mental illness;
   (5) Juvenile delinquency;
   (6) Adoption proceedings;
   (7) Dependent children; and
   (8) Operation of motor vehicles upon the public streets, alleys, roads and highways. *Provided further,* that Indian tribes that petitioned for, were granted and became subject to state jurisdiction pursuant to this chapter on or before March 13, 1963 shall remain subject to state civil and criminal jurisdiction as if chapter 36, Laws of 1963 had not been enacted.
   This partial assumption of jurisdiction over Indians (based on the status of the land on which the questioned activity occurred) has been sanctioned by the Supreme Court. *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979).

from the Tribe. This argument is without merit for several reasons.

To begin with, P.L. 280 neither increased nor diminished a state's authority over the reservation activities of non-Indians. In no way can it be construed as a grant of such authority—no such grant was necessary. Under P.L. 280, states retain the same regulatory jurisdiction over the on-reservation activities of non-Indians "that they enjoyed prior to that Law". *White Mountain Apache Tribe v. State of Arizona*, 649 F.2d 1274, 1279 (9th Cir.1981). And it is settled law that long before the enactment of P.L. 280, states (and presumably a political subdivision like Yakima County) had the power to assert sovereign powers over the reservation activities of non-Indians. *See, e.g., Draper v. United States*, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896); *Utah & Northern R.R. v. Fisher*, 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542 (1885). As discussed *infra*, the only limitations on that power are the independent but related barriers of "infringement on the inherent tribal sovereignty", *see e.g., Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959) and the doctrine of "federal preemption". *See e.g., New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983).

Further evidence that P.L. 280 did not in any way affect the powers of a state over non-Indians is the law's purpose. P.L. 280 was designed to remedy the problem of the lack of state jurisdiction over *Indians* in their dealings (criminal or civil) with non-Indians. *See* Goldberg, *Public Law 280: The Limits of State Jurisdiction Over Reservation Indians*, 22 U.C.L.A. Law Rev. 535 (1975). The states needed Congressional authorization to exert power over Indians. No such authorization was needed, however, as to the states' authority over non-Indians. Thus, P.L. 280 was *not* a grant to the states of jurisdictional powers over non-Indians. Accordingly, it cannot be construed as supplanting the tribe's authority with state authority[7] or divesting the tribe of whatever inherent power it has over the reservation activities of non-Indians. *See Cardin v. De La Cruz*, 671 F.2d 363 (9th Cir.1982), *cert. denied*, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982); *Sechrist v. Quinault Indian Nation*, I.L.R. 3064 (W.D.Wash.1982).[8]

2. YAKIMA COUNTY AUTHORITY: Preemption

Having concluded that the Yakima Nation may exercise its regulatory authority over the Brendale property, the court's inquiry must now focus on whether Yakima County may also exert its authority over the same property, *i.e.* whether Yakima County may exercise concurrent jurisdiction. While it is unquestioned that Yakima County has the authority to exercise jurisdiction over non-Indian activities on the Reservation, *see e.g., New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983); *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 51–53 (9th Cir.1981), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981), that power is not boundless. It is limited by the twin barriers of "infringe-

7. Even if P.L. 280 were interpreted as an affirmation or expansion of the state's jurisdiction over non-Indians, it is limited to "civil litigation" and not "general state civil regulatory control" such as zoning. *See Bryan v. Itasca County*, 426 U.S. 373, 384–85, 96 S.Ct. 2102, 2108–09, 48 L.Ed.2d 710 (1976); *Barona Group of Capitan Grande Band v. Duffy*, 694 F.2d 1185, 1188 (9th Cir.1982) (P.L. 280, does not enable California to impose its *regulatory* bingo laws on the reservation); *United States v. County of Humboldt*, 615 F.2d 1260 (9th Cir.1980) (California municipality may not zone restricted lands); *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir.1976) (California county may not zone restricted lands).

8. Both cited cases upheld the Quinault Indian Nation's application of its zoning laws to non-indian owned deeded lands. The State of Washington exercises the same degree of P.L. 280 jurisdiction over the Quinault Indian Reservation as it does over the Yakima Reservation. *See, Comenout v. Burdman*, 84 Wash.2d 192, 525 P.2d 217 (1974). Implicitly then, these two cases must be interpreted as rejecting the notion that P.L. 280 stripped tribes of their civil jurisdictional authority.

ment on tribal sovereignty"[9] and "federal preemption".[10] Although related in concept, these twin barriers are independent and either standing alone may be sufficient to block the county's attempt to assert its power. *White Mountain Apache Tribe v. Bracker*, 448 U.S. at 142, 100 S.Ct. at 2582. In other words, Yakima County may extend its regulatory authority onto the Yakima Nation Reservation up to the point where it either infringes on the Tribe's inherent authority or where it is preempted by federal law. In this case, where the county seeks to regulate the activities of non-Indians on fee land, the inquiry must focus on the preemption barrier.[11]

■ When used in the context of Indian law, the doctrine of preemption is applied uniquely. Due to the "historical origins of tribal sovereignty" and the federal commitment to tribal self-sufficiency and self-determination it is "treacherous to impart ... notions of preemption that are properly applied to other contexts." *Bracker*, 448 U.S. at 143, 100 S.Ct. at 2583. Unlike preemption in other contexts, Indian law preemption does not require "an express congressional statement to that effect," *Id.* at 144, 100 S.Ct. at 2584, nor does it even require "a narrow focus on congressional intent to preempt state law". *New Mexico v. Mescalero Apache Tribe*, 103 S.Ct. at 2386. Rather, "state [county] jurisdiction is preempted by federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state [county] interests at stake are sufficient to justify the assertion of state [county] authority." *Id.* at 2386. In other words, a preemption analysis rests principally on a consideration and balancing of the competing federal, county and tribal interests at stake. *Id.* at 2386.

■ Federal and tribal interests are assessed from a broad perspective. Traditional notions of Indian sovereignty and the federal government's commitment to the promotion and protection of tribal resources and cultural values are considerations which must be weighed on the preemption scales. *E.g., New Mexico v. Mescalero Apache Tribe*, 103 S.Ct. at 2386–2387; *Ramah Navajo School Bd. v. Bureau of Revenue*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982). On the other hand, an assessment of the county's interest is guided by more narrow and specific considerations. The concept of county sovereignty and general county governmental interests are of limited importance. *See, e.g., Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). "Yet, a state's [county's] regulatory interest will be particularly substantial if the state can point to off-reservation effects that necessitate state [county] intervention." *New Mexico v.*

---

**9.** The "infringement" barrier has as its foundation the right of a tribe to exercise traditional governmental functions. The exercise of state authority may be barred if it "unlawfully infringes 'on the right of Indians to make their own laws and be ruled by them'." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980), quoting *Williams v. Lee*, 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959).

**10.** The preemption barrier, on the other hand, is based upon the federal supremacy clause and the federal government's plenary power over Indian Tribes. See, *e.g., Ramah Navajo School Board v. Bureau of Revenue*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982); *Central Machinery Co. v. Arizona Tax Comm'n*, 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980).

**11.** Since the infringement barrier is derived from the right of tribal self-government, it is primarily applicable where intratribal relations are implicated. *White Mountain Apache Tribe v. State of Arizona*, 649 F.2d 1274, 1275 (9th Cir.1981). Yakima County's Regulation of Mr. Brendale's property does not violate the right of tribal self-government. Concurrent jurisdiction over Brendale's property would require him to comply with the regulations of Yakima County *and* the Yakima Nation. Thus, Yakima County would not be infringing on the Yakima Nation's right to "make their own laws and be ruled by them." *See Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (state taxation of on-reservation cigarette purchases does not intrude upon or diminish the tribe's authority to also tax); *White Mountain Apache Tribe v. State of Arizona*, 649 F.2d 1274, 1285 (9th Cir. 1981) (state hunting and fishing regulations may be applied to non-Indians on reservations without violating the right of tribal self-government).

*Mescalero Apache Tribe,* 103 S.Ct. at 2387; *Colville Confederated Tribes v. Walton,* 647 F.2d at 52–53.

■ As stated in this court's Findings of Fact, Yakima County's interest in regulating the at-issue Brendale property is minimal. Yakima County conceded that its interest was limited to a general concern of providing regulatory functions to its tax paying citizens. Furthermore, the county did not point to any "off-reservation effects" which the Tribe's regulation of Brendale's property would produce. To the contrary, the county agreed, and this court so finds, that the Tribe's exercise of its regulatory authority over the fee land will not produce effects outside the Reservation boundary. In sum, the court concludes that Yakima County's interests tip the preemption scales only slightly.

On the other hand, the interests of the Yakima Nation weigh heavily on the preemption scales. The Closed Area provides immense benefit to the Yakima Nation. It's timber produces substantial tribal income; its flora and fauna provide a ready source of subsistence; its sacred areas help sustain the spiritual needs of the tribal members; and its beauty most certainly contributes to the general health and welfare of the Tribe. Those resource and cultural values carry great weight. And, given the unique character of the Closed Area, it is imperative that the Yakima Nation be able to exercise complete control over its use. Accordingly, the court concludes that the interests of the Yakima Nation in exerting its authority over the Brendale property far outweighs the interests of Yakima County; thus, Yakima County is preempted

from exercising concurrent jurisdiction and the Yakima Nation's jurisdiction over Brendale's property is exclusive.

**B. SECTION 1983 CLAIM:** [12]

The bases for the Yakima Nation's civil rights claim are twofold. First, the Tribe asserts that the County Commissioners denied it due process of law by not providing the Tribe a meaningful opportunity to be heard on the jurisdictional issue. Second, the Tribe argues that Yakima County's attempts to exercise jurisdiction over the Brendale property violated rights enforceable under Section 1983. For the reasons discussed below, the court concludes that neither of these two alleged bases of Section 1983 liability has merit.

■ Assuming that the Yakima Nation is a proper plaintiff in a Section 1983 action,[13] the court finds that it was not denied due process of law by the Yakima County Commissioners. The purpose of the hearings conducted on August 1, 2, 8 and 9, 1983 was to hear the Tribe's appeal of the Planning Department's Declaration of Non-Significance. The hearing was statutorily mandated to provide the Tribe with the opportunity to convince the Commissioners that the Planning Department had erred and show that Brendale's proposed development warranted the preparation of an Environmental Impact Statement—which the Tribe succeeded in doing. The hearing was neither designed as a forum to contest jurisdiction nor was it an appropriate forum for such a debate. As demonstrated by the complexity of this lawsuit and the cases cited in this opinion, Indian reserva-

---

**12.** 42 U.S.C. § 1983 states:
  Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**13.** The parties have expended considerable effort in debating whether an Indian Tribe such

as the Yakima Nation may bring a Section 1983 action. The resolution of that issue turns on whether the Tribe is "any citizen of the United States or other *person* within the jurisdiction thereof...." 42 U.S.C. § 1983 (emphasis added). Neither the court nor the litigants have located any legal precedent which directly addresses that issue. It is not, however, necessary to answer that novel question since the court concludes that the Yakima Nation has not been deprived of "any rights, privileges, or immunities secured by the Constitution and laws...." *Id.*

tion jurisdictional disputes are not easily resolved. It is unrealistic for the Yakima Nation to expect and even demand that it be given free reign at the administrative podium to argue and present evidence pertaining to the issue of jurisdiction, particularly when the Commissioner's sole function was to determine whether an EIS was warranted. The Commissioner's decision to allow the Yakima Nation to state its objections to the county's jurisdiction over the Brendale property and then going forward with the appeal hearing was the proper course of action. The Tribe suffered no infringement on its rights to due process of law. *See generally Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ While the Tribe's first basis for its Section 1983 claim must fail because no due process deprivation occurred, the Tribe's second ground for relief fails because it involves a "right" which is not within the scope of Section 1983 relief. Based upon this court's conclusion that Yakima County is preempted from exerting its land use authority over the Brendale property, there can be little argument that its attempts to do so were unlawful. It can be said, therefore, that the Yakima Nation has a "right" to be free from such unlawful action. Nevertheless, not all federally created rights are "enforceable" under Section 1983. *See generally, Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980).

■ The Tribe's "right" to be free from the county's concurrent jurisdiction is derived from the doctrine of federal preemption. But for the operation of that doctrine, the Yakima Nation would be powerless to interfere with the county's authori-

ty. As mentioned previously, the source of preemption as applied in Indian law cases is the federal government's plenary power over Indian Tribes and the Supremacy Clause, U.S. Const. Art. VI, § 2. *See e.g., Ramah Navajo School Board v. Bureau of Revenue,* 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982); *Central Machinery Co. v. Arizona Tax Comm'n.,* 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980). Of course, "traditional notions of Indian self-government" provide an important "backdrop" which color the preemption doctrine. *McClanahan v. Arizona State Tax Comm'n.,* 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973).

The Supreme Court has held that a Supremacy Clause violation does not give rise to Section 1983 relief. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 615, 99 S.Ct. 1905, 1914, 60 L.Ed.2d 508 (1979). Mere incompatibility between federal and state (local) laws "does not, in itself, give rise to a claim 'secured by the Constitution.'" *Id.* The portion of the Civil Rights Act of 1871 now codified as Section 1983 was directed at organized terrorism and the unwillingness or inability of state officials to control the widespread violence. *Id.* at 610 n. 25, 99 S.Ct. at 1912 n. 25. Thus, Section 1983 is concerned with the relationship between individuals and the state in matters involving life, liberty or property. It was not intended to apply to the distribution or allocation of power between a state and the federal or tribal government. See *id.* at 615, 99 S.Ct. at 1914; *Consolidated Freightways Corp. of Delaware v. Kassel,* 730 F.2d 1139 (8th Cir.1984) (violation of Federal Commerce Clause does not secure rights within the meaning of Section 1983) *cert. denied,* — U.S. — 105 S.Ct. 126, 83 L.Ed.2d 68 (1984). In order to be entitled to relief under Section 1983, the Yakima Nation must rely on some enforceable right beyond its Supremacy Clause-derived "right" to preempt conflicting County regulations. Thus, the court concludes that the plaintiff has not stated a Section 1983 claim and is

therefore not entitled to attorney's fees under Section 1988.[14]

## ATTORNEY FEES

■■ Based upon the dismissal of the Section 1983 claims against them, defendants Glaspey and Brendale have filed petitions for attorney fees as "prevailing" parties.[15]  42 U.S.C. § 1988.  A prevailing defendant in a Section 1983 case may recover attorney fees "only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant."  *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1937 n. 2, 76 L.Ed.2d 40 (1983); *Boatowners and Tenants Association v. Port of Seattle,* 716 F.2d 669 (9th Cir.1983).  The court finds that none of those prerequisites to fees exists in this case.

There is no contention that plaintiff's Section 1983 claims against these two defendants was vexatious or brought to embarrass them.  The defendants do, however, argue that the Section 1983 claims against them were frivolous.  Glaspey contends that the action was frivolous as to him because he had no ownership interest in the Brendale property.  While the court does agree that the plaintiff should have extensively investigated the surrounding facts to ascertain the identity of the necessary party defendants, *see* Fed.R.Civ.P. 11, the court is unable to conclude that the inclusion of Frank Glaspey was frivolous.

Defendant Brendale asserts that the suit against him was frivolous as there was no evidence that he acted "under color" of state law.  Notwithstanding the court's dismissal of the Section 1983 claim on those grounds, the plaintiff's claim was not frivolous.  The caselaw construing the "under color" of law language demonstrates that the application of that phrase is anything but precise.  *See e.g., Howerton v. Gabica,* 708 F.2d 380 (9th Cir.1983); *Fonda v.*

*Gray,* 707 F.2d 435 (9th Cir.1983); *Scott v. Rosenberg,* 702 F.2d 1263 (9th Cir.1983); *Arnold v. International Business Machines,* 637 F.2d 1350 (9th Cir.1981).  The courts' difficulty in establishing definitional parameters has resulted in almost a case-by-case analysis.  For that reason, it was not unreasonable or frivolous for the plaintiff to assert that Brendale was acting "under color" of law when he sought Yakima County approval of his proposed development.

## CONCLUSION

Based upon the above Findings of Fact and legal conclusions, judgment shall be entered in favor of the plaintiff as against all defendants (except Frank Glaspey) to the following extent: The court declares that the Yakima Indian Nation has exclusive regulatory jurisdiction over the land use of the Brendale property described on page 12 of this memorandum opinion.

As to plaintiff's 42 U.S.C. § 1983 claims, judgment shall be entered in favor of defendants Jim Whiteside, Graham Tollefson, Charles Klarech, Richard Anderwald, Philip Brendale and Frank Glaspey.

Plaintiff's 42 U.S.C. § 1983 claims are DISMISSED WITH PREJUDICE.

All parties shall bear their own attorney fees.

IT IS SO ORDERED.  The Clerk is directed to enter this Order and forward copies to counsel.

---

**14.**  42 U.S.C. § 1988 provides:
> In any action or proceeding to enforce a provision of sections 1981, 1983, 1985, and 1986 of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

**15.**  During the trial the court dismissed all of plaintiff's claims against Glaspey.  At the conclusion of the trial the court dismissed plaintiff's Section 1983 claim against Brendale, finding that Brendale had not acted "under color" of state law.  42 U.S.C. § 1983.