Frank PETERSON; Priscilla Peterson, husband and wife, Plaintiffs–Appellees,

v.

MINIDOKA COUNTY SCHOOL DISTRICT NO. 331, a body Corporate and Politic of the State of Idaho, Defendant–Appellant.

Frank PETERSON; Priscilla Peterson, husband and wife, Plaintiffs–Appellants,

v.

MINIDOKA COUNTY SCHOOL DISTRICT NO. 331, a body Corporate and Politic of the State of Idaho, Defendant–Appellee.

Nos. 95–35041, 95–35185.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 1996.

Decided July 8, 1997.

Steven K. Tolman, Tolman Law Office, Twin Falls, ID, for defendant–appellant–cross–appellee.

Frederick J. Hahn, Holden, Kidwell, Hahn, & Crapo, Todd J. Wilcox, Boise, ID, for plaintiffs–appellees–cross–appellants.

Before: FLETCHER, JOHN T.
NOONAN, Jr. and RYMER, Circuit Judges.

NOONAN, Circuit Judge:

The Minidoka County School District No. 331, a corporate and politic body of the State of Idaho, (the District) appeals the judgment in favor of Frank Peterson and his wife Priscilla in their action against the District. The Petersons cross-appeal the denial of attorney's fees. We affirm the judgment of the district court in favor of the Petersons. We reverse the denial of attorney's fees and remand for their award.

*FACTS NOT IN DISPUTE*

At the beginning of 1992 Frank Peterson was the principal of Paul Elementary School. He had a contract to serve as principal which was annually reviewed by the District on the basis of written evaluation of his performance being submitted by the Superintendent's office to the Board of Trustees of the District (the Board). For fifteen years the evaluations had been favorable, and his contract as principal had been renewed. In January 1992 Peterson informed Robert L. Pavlock, one of two Assistant Superintendents, that he was contemplating home schooling for his children. That communication began the series of events culminating in this lawsuit.

The Petersons are the parents of twelve children. In January 1992 eight were between the ages of 7 and 16 and so of age to attend public schools; four were below seven. None of the eight was enrolled in Paul Elementary School, but were enrolled in other public schools. Priscilla Peterson was a homemaker whose work was her own home. Under Idaho law attendance at a public, private, or parochial school was compulsory, unless the child was "otherwise comparably instructed, as may be determined by the board of trustees of the school district in which the child resides." Idaho Code § 33–202 (1991).

Pavlock informed the Petersons that they needed to submit information to the Board so that the Board could determine whether the children would be comparably educated at home. The Superintendent's office also informed the Board that the Superintendent was neutral as to the Petersons' proposed choice. On February 14, 1992, Peterson received his annual evaluation, indicating that his performance was satisfactory with the exception of two areas, irrelevant to this suit, that could stand improvement. The evaluation did not refer to the matter of home schooling. On February 18, 1992, however, when the Board met with each school administrator, the matter came up in discussion with the Board, and the decision was taken by Superintendent Michael Bishop and the Board "to delay [their] actual rehiring until [they] could further investigate what Frank's intentions were."

Thereafter, the rumor spread through the school district that the Petersons would be getting into home schooling. Teresa Lowder and Helen Wyant, the co-presidents of the teachers' association and themselves teachers at Paul Elementary, called on Superintendent Bishop and told him that Frank Peterson had met with his faculty and told them what he was thinking of doing and why, and that after the meeting there was "quite a turmoil amongst the staff." They added that the teachers at Heyburn School had felt "betrayed" or "disappointed" by a decision which affected the Peterson children in public school at Heyburn. The school secretary at Paul Elementary took around 25 telephone calls during the period February through May 1992 from parents critical of what they understood their principal's plan to be. Individual members of the Board also received calls from parents or teachers. None of the critics filed formal or written complaints. Neither the Board members nor the Superintendent's office nor the school secretary made a written record of the calls or kept the names of the complainers. The Superintendent's office did draw the inference that home schooling by the Petersons would engender a loss of confidence in the principal as a leader at his school. Superintendent Bishop believed Peterson was not doing his job because he was not dealing with the reason why people were concerned.

Bishop also believed on the basis of his own experience as a principal that Frank Peterson could not do his job as a principal, a job that required him to be available some evenings as well as during the day, and home school his children; and Bishop did not see how Priscilla Peterson, unaided, could home school eight children of different ages. The Petersons had not submitted any information in response to Assistant Superintendent Pavlock's request for information on their planned curriculum.

Bishop visited, as he put it, with Peterson about his interest in home schooling and his reason for thinking of doing it. Bishop learned that "it was purely a reason to educate his kids with an aspect of God being the creator in all of the classes that they would teach." Peterson added that "he felt that that was not obtainable in the school."

On May 6, 1992, Assistant Superintendent Pavlock wrote Peterson: "In light of your verbal notification to me that your children will be home schooled for the 1992–93 school year a professional assignment change will be made." The change was to move Peterson to "an elementary teaching position."

The decision to reassign was the responsibility of the Superintendent subject to review by the Board. Peterson was asked to meet with the Board in an executive session on May 19, 1992. The minutes of the meeting run, in relevant part, as follows:

Frank Peterson, Principal, Paul Elementary was asked into the executive session. A discussion followed regarding Mr. Peterson taking his children out of school to teach them at home. The board is concerned about Mr. Peterson's effectiveness as a principal when the staff is extremely distressed and concerned, feeling that they aren't good enough to teach the principal's children. Mr. Peterson expressed that he would like to have an administrator's contract and that he thought he would like legal counsel regarding his civil rights. Superintendent Bishop commented that the board is not saying you are going to lose your job, but the board does have the right to reassign. A discussion followed. Chairman Elison concluded that it is a tough decision on both parts, that no deci-

sion has been made and hopefully it can be resolved in the best interest of both parties. Mr. Peterson was excused from the executive session. The board then gave direction to Roger Ling to write a letter to Mr. Peterson asking that he state his intentions within ten (10) days.

A letter to Peterson as directed by the Board was drafted, signed, and sent by Roger Ling, the Board's counsel. Ling concluded: "After the school district has received official notice from you as to your intentions, the Board of Trustees will determine whether or not a contract will be offered to you as a school administrator or reassigned as a teacher." On June 1, 1992, Peterson replied: "I feel that the information the Board requested in the letter is personal and private information. I believe that the information requested should not be relevant to a decision by the Board of Trustees regarding my employment status. I choose not to divulge the information requested."

On June 4, 1992, the District offered a teaching assignment to Peterson. He rejected it. Bishop met with him and urged him to take a teaching post and file a grievance if he felt unfairly treated. Peterson did not accept this advice.

Peterson sought employment in three other school districts but was offered nothing. In August 1992 he began a truck-driving job, in which he earned $3,990 through December 1992. He applied to 30 to 40 other employers without success. He then invested in the purchase of three trucks and began a trucking business that ceased to be viable after Christmas 1993. His income and status in the community had visibly changed since his reassignment and discharge from Paul Elementary.

## PROCEEDINGS

On August 31, 1992, the Petersons filed this suit in the district court against the District, the members of the Board, the Superintendent and two Assistant Superintendents, naming all the individuals both in their official and individual capacities. The suit alleged causes of action under 42 U.S.C. § 1983 and under Idaho law. After the tak-

ing of depositions both sides moved for summary judgment. On November 22, 1993, a comprehensive and careful report with recommendations was filed by Mikel H. Williams, the Magistrate Judge to whom all pretrial matters had been referred. The district court, after an independent review of the record, accepted all of the recommendations, as follows:

The Petersons were granted summary judgment on Count Three, that their freedom of religion had been violated by the District, and on Count Four, that their constitutional right as parents to direct their children's education had been violated. Building on these holdings, the court also granted summary judgment on Count One, the Petersons' claim that the District had denied Frank Peterson procedural due process. On Count Six, the Petersons' claim of breach of contract, and on Count Eight, breach of the implied covenants of good faith and fair dealing, they were also awarded summary judgment. At the same time, the court ruled in favor of the District on Count Two, violation of Frank Peterson's freedom of speech; Count Five, the Petersons' right to home school under Idaho Code § 33–202; Count Seven, wrongful termination and breach of the public policy of Idaho; Count Nine, intentional infliction of emotional distress; and Count Ten, negligent infliction of emotional distress. The court ruled that all of the individual defendants were entitled to qualified immunity because the law was not clearly established that reassignment of Peterson violated his constitutional rights.

Thereafter, a jury trial followed to determine damages on the counts as to which the Petersons had been granted summary judgment. The jury awarded the plaintiffs $200,000 in special damages and $100,000 in general damages. The court denied the plaintiffs' motion for attorney's fees as untimely.

The District appeals the grant of summary judgment and challenges the instructions on damages. The Petersons cross-appeal the denial of attorney's fees.

## ANALYSIS

■ *Free Exercise of Religion.* The free exercise of religion—the robust putting into practice of a person's religious beliefs—is guaranteed against congressional impairment by the Bill of Rights and insured against intrusion by state or municipal authority through the incorporation of the First Amendment's guarantees into the Fourteenth Amendment. Specifically, as to the exercise of religion by parents in their choice of schooling for their children, the right is established by *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

The District notes that at the trial for damages Priscilla Peterson testified to a motivation that seems secular: her love for children. That testimony was not before the court at the time of summary judgment. The District also points out that Frank Peterson told the Superintendent that he was acting at his wife's urging. But that statement did not disavow or contradict his religious motivation, which, when summary judgment was granted, was uncontroverted.

No dispute exists as to Frank Peterson's desire to exercise his religious right. Superintendent Bishop's deposition shows that Peterson stated to him his reason for home schooling his children: it was that in every course of study they would learn that God as the creator of all things was related to the subject at hand. The belief in God as the creator, set out in the opening chapters of the Bible, is among the most basic and most pervasive of tenets in the biblical religions that have entered into our civilization. To relate that belief to education is a type of exercise of religion. Creation by God implies purpose and design in what God has created. From the perspective of the believer God is not another category to be considered along with other forces, but a living presence guiding the teacher and the student.

■ Frank Peterson is a member of the Church of Jesus Christ of Latter–Day Saints. His membership in a theistic church is confirmatory of his free exercise claim, although he does not contend that his church requires that he home school his children. Unlike the corporate claim made by the Amish in *Yoder,* Frank Peterson's claim is based on his per-

sonal sense of what his religion requires. There is nothing in the First Amendment's guarantee of the free exercise of religion that restricts the guarantee to the requirements of a church.

■ It is contended that Frank Peterson did not demonstrate that the home schooling of his children examining each subject in the light of a Creator–God was "mandated" by his religion. That an act was "mandated" by religious belief has been a judicial category used in upholding a free exercise claim. *See, e.g., Thomas v. Review Bd. of the Indiana Employment Security Division*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981). What is mandated by religion, however, is not to be equated with what is minimally required of adherents of a religion. What is mandated is what the individual human being perceives to be the requirement of the transhuman Spirit to whom he or she gives allegiance. To adapt a Holmesian phrase, what is mandated is a "can't help." The person who responds to the Spirit "can't help" believing that the response is required. Francis of Assisi was exercising his religion when he gave his costly clothes to the poor; if a government had tried to prevent the gesture it would have violated his free exercise although he acted from no binding precept. What the Constitution protects is an act "rooted in religious belief." *Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533. It was undisputed that Peterson's act was so rooted. .

■ Frank Peterson had the constitutional right to exercise his religion. This precious liberty, however, is not so absolute that its exercise may be enjoyed without collateral consequences if, in exceptional circumstances, that exercise impacts a compelling state interest. *See Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533. These circumstances and that impact upon a compelling interest are present here, the District argues: the state's high interest in education, *Yoder*, 406 U.S. at 213, 92 S.Ct. at 1532, requires effective principals in its public schools; Peterson's performance as a principal would be seriously impaired both by the drain on his time and energy of attending to the home schooling of his own children and by the loss of confidence in his commitment to the public schools with attendant distrust in him as a leader on the part of teachers and parents of public school children. When the facts are undisputed, it is a question of law, not a question of fact, whether these concerns outweigh Peterson's exercise of his constitutional right. *See Scott v. Rosenberg*, 702 F.2d 1263, 1267, 1274 (9th Cir.1983), *cert. denied*, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984). The district court rightly concluded that they did not.

The criticism and the concerns felt by the District must be assessed in terms of their relationship to Peterson's exercise of his constitutional right. As to the concern as to his ability to do the job, the District had the power conferred by Idaho law to inspect and approve the proposed home instruction curriculum: orderly procedure would have been to insist upon the Petersons providing this information before reaching a judgment as to what Frank Peterson's role would be at home. *See* Idaho Code § 33–202 (1991). As to the concern for loss of confidence in his leadership, the District was bound to take account of the fact that he was exercising a constitutional right and that accommodation of uninformed and prejudiced persons was not a compelling state interest outweighing that exercise. The depositions of the District's administration uniformly reveal a supine response to Peterson's critics. It was his business, not theirs, they said, to explain and defend his proposed course; but it was their business not to trammel his exercise of religion without compelling reason.

The District could only assert a compelling interest if well-informed persons understood Peterson's action as a vote of no confidence in the school system rather than as the practice of his religion. The District gave in too easily in reasoning that a religiously-motivated school principal following his conscience as to his own children would somehow be the object of scorn or distrust of his faculty or parent patrons. The district court as a matter of law rightly determined that the District's interests were not compelling.

*The Right of Parental Choice in the Education of Children.*

■ It was declared over seventy years ago:

Under the doctrine of *Meyer v. Nebraska,* 262 U.S. 390 [43 S.Ct. 625, 67 L.Ed. 1042], we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control. As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State. The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

*Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925). In light of that teaching, "liberty" in the Fourteenth Amendment encompasses the liberty of parents to determine the education of their children.

■ Like other freedoms this freedom is not absolute. The state's own high interest in education limits it. *Yoder,* 406 U.S. at 233, 92 S.Ct. at 1542. The Petersons do not challenge the Idaho law that regulated their right. The District does not argue that the Petersons planned to violate that law. Consequently, the question on this appeal must be whether the District's two concerns about Frank Peterson's work as principal outweighed the Petersons' constitutional right to avail themselves of the Idaho statute. That question is resolved by the analysis already set out as to the free exercise of religion. Our conclusion must be that the district court correctly decided as a matter of law that the District's interest did not outweigh the Petersons' constitutional liberty.

*The Basis for the Reassignment.*

■ The Petersons should not have succeeded on their constitutional claims if the District had shown "by a preponderance of the evidence that it would have reached the same decision as to [Peterson's] re-employment even in the absence of the protected conduct." *Mt. Healthy City School District Board of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The District argues that in fact it reached the decision to reassign because of Peterson's refusal to respond to the Board's letter of May 20, 1992.

Assistant Superintendent Pavlock's letter of May 6, 1992 shows the decision to reassign already taken; and the depositions of the members of the Board indicate that, although the Board had the authority to review the Superintendent's decision, there was no disposition on the part of the Board to do so unless Peterson gave up his plan. The chairman of the Board, David M. Elison, was asked during his deposition: "And then as of May 19th ..., at that point in time, had the Board concluded that if Frank advised the Board that he was going to home school, he would be reassigned?" Elison answered: "That was the gist of the conversation and of the directive." In response to a later question as to what the Board would do if Peterson answered the question as to his intentions by saying he would home school, Elison replied: "it was pretty well the opinion that it would affect his effectiveness to the point that we would rather have him reassigned than continue as principal." In the same deposition, Elison stated: "I'd say the main consideration in regard to the decision which ultimately was made to reassign would have to do with the fact that he was not willing to cooperate with the Board and tell us what his intentions were regarding the matter which we felt would directly affect his administration in that building. He was reassigned not because he was going to home school, but because he just simply was not willing to work with the Board in regard to that decision which he was going to make." If this statement of Elison is read as contradicting his other deposition testimony, the mutually cancelling statements do not create a triable dispute. But the second statement is more intelligibly read as the technical or formal grounds the Board chose for a reassignment already decided upon if Peterson chose to home school.

Nothing in the record contradicts Elison's account of what the disposition of the Board was if Peterson entered on home schooling. As the minutes of that May 19, 1992 meeting of the Board reflect, no formal decision was recorded because the Board was yet unsure what Peterson's course would be. But Peterson knew from Pavlock's letter of May 6, 1992, which was never rescinded, what the Board would do if he advised them that he was going to home school. Peterson declined to answer in the light of that knowledge. The Board, not rescinding Pavlock's letter, had created the situation where Peterson knew he would be reassigned if he opted for home schooling. The District had so informed him officially. The Board's request for an answer was only a last attempt to get him to disavow the intention he had announced to Pavlock. When Peterson declined this invitation, the District seized on it to carry out a reassignment already decided upon. The District's reliance on this formality falls so far short of the preponderance of the evidence that the district court justly concluded as a matter of law that the District had failed to produce evidence that the District would have reassigned Peterson even if he had not proposed to exercise his constitutional rights.

■ *Due Process of Law.* Peterson was entitled to due process of law in deprivation of his property in his principalship if he had such property. On the underlying question of whether he had such a property, his contract is argued to be ambiguous. On the one hand, Policy 504.1 of the District states:

> With respect to the employment policies, practices and procedures of the District, the only criteria for recruiting, selecting, hiring, promotion, compensation, transfer, reassignment, discipline, demotion, lay off and termination of all employees or applicants for employment will be individual work merit and ability, job qualification and job performance. Specifically prohibited by this policy is discrimination against employees or job applicants on the basis of sex, age, ancestry, national or ethnic origin, race, color, exceptionality, religion, family relationship, or personal or political patronage.

The policy limits the grounds on which the District may base a nonrenewal and creates a property interest in the employee. *See Brady v. Gebbie,* 859 F.2d 1543, 1548 (9th Cir. 1988), *cert. denied,* 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989); *Arnzen v. State,* 123 Idaho 899, 854 P.2d 242, 247–48 (1993), *cert. denied,* 510 U.S. 1071, 114 S.Ct. 877, 127 L.Ed.2d 73 (1994).

On the other hand, state law governing renewable contracts of "certificated employees" of school districts provides: "Nothing herein shall prevent the board of trustees from offering a renewed contract increasing the salary of any certificated person, or from reassigning administrative or supervisory employees to classroom teaching duties or removing an extra duty assignment from a certificated employee with appropriate reduction of salaries from pre-existing salary levels." Idaho Code § 33–515. The District notes that both this statute and Policy 504.1 are part of Peterson's contract with the District. That contract expressly incorporates both "the applicable laws of the State of Idaho" and "the policies of the District." The District contends that the policy and the statute are in conflict making the construction of the contract ambiguous and properly a factual question to be decided by a jury determining the intention of the parties. *Bondy v. Levy,* 121 Idaho 993, 829 P.2d 1342, 1346 (1992).

■ The District's contention is worth considering but is ultimately unpersuasive. The usual rule of interpretation of contracts is to read provisions so that they harmonize with each other, not contradict each other. That task of construction is for the court. *See, e.g., Hughes Aircraft Co. v. North American Van Lines,* 970 F.2d 609, 613 (9th Cir. 1992) (interpreting a contract's attachments so they can be reasonably read together and affirming grant of summary judgment against drafter of the contract).

The District's reading of the contract is forced and unnatural. Idaho Code § 33–515 governs renewable contracts generally and makes specific reference to administrators in order to assure that their contracts do not fall under its general terms for automatic renewal. Nothing in the statute denies a

school district the power to limit its power over administrators by adopting a policy restricting its statutory discretion. The District did so here, when it adopted Policy 504.1 and incorporated it into Peterson's contract. No conflict, no ambiguity exists.

Peterson, therefore, had a property right in the principalship that could be ended only in conformity with the criteria set out in the District's policy. The established practice was for that policy to be carried out by evaluations made by the superintendent. Without notice, without hearing, and without an evaluation, Peterson lost his appointment at Paul Elementary. He was denied the process of law due him in terms of his contract and the policy of the District.

*Breach of Contract and Breach of the Implied Covenants of Good Faith and Fair Dealing.* The foregoing analysis applies to Peterson's claim of breach of contract. The District argues that if we should hold that Peterson was not an employee at will, Idaho law does not extend the implied covenants of good faith and fair dealing to a person in his position. To the contrary, Idaho law extends the protection of these covenants to "the employment contract." *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 778 P.2d 744, 749 (1989). No reason is suggested why employment-at-will should be protected by such undertakings but not employment that constitutes property.

*Damages.* The District argues that the Petersons were not entitled to general damages for "mental anguish, humiliation, embarrassment, and emotional distress." The jury was properly instructed to consider these elements. The evidence of Peterson's desperate struggle to survive after the summer of 1992 fully supported the award.

The District also argues that the jury should have been told that Peterson had a duty to mitigate damages within a reasonable time after his discharge by accepting any work for which he was reasonably qualified. Error, if any in not so instructing, was harmless in the light of the evidence for the employment at all levels of work that Peterson sought and accepted. The jury was also properly instructed to offset Peterson's earnings against any lost salary in computing his special damages. The damages awarded were unexceptionable.

*Attorney's Fees.* The Petersons filed their petition for attorney's fees on September 30, 1994, 30 days after August 31, 1994, the day the clerk of the court entered the judgment upon the jury verdict. The old local rule had specified that such a petition was to be filed no later than 30 days after final judgment. The new rule, effective July 1994, provided:

> Within fourteen (14) days after entry of final judgment, a party claiming the right to allowance of attorney fees may file and serve a petition for such allowance.... Failure to comply with this requirement will result in delay in processing. D.Id.LR 54.3

When the Petersons' counsel learned of the new rule, they moved on October 19, 1994 for an extension of time within which to file. The court denied the motion for extension on December 14, 1994 and also denied the attorney's fees. However, on the same date the district court denied the post-trial motions of the District for judgment as a matter of law and for a new trial. On December 30, 1994, fourteen days later, the Petersons refiled their petition for these fees. On March 31, 1995, the court denied the petition as untimely under Local Rule 54.3.

The district court was in error. Final judgment was not entered until the court denied the District's Rule 59 motion on December 16, 1994. *See Yniques v. Cabral*, 985 F.2d 1031, 1033 (9th Cir.1993). The Petersons' motion for attorney's fees fell within the limit set by the local rule.

Accordingly, the judgment of the district court is AFFIRMED in all respects except as to the award of attorney's fees. The judgment is REVERSED as to them, and the case is REMANDED for their award.

FLETCHER, Circuit Judge, Concurring:

I concur in the result of Judge Noonan's opinion. I do so because the record leaves no room for any other conclusion than that the school district chose to reassign Peterson on the basis of vague concerns voiced by

teachers and parents that the principal entertained thoughts that he might home school his children in order to provide them a religious education. The record is also clear that he had not presented a home school plan for approval. He had not removed the children from school.

What the district court had to balance, then, was Peterson's right to free exercise of his religion and to control the education of his children (subject to reasonable regulation), against the district's vague concerns that Peterson might no longer be an effective leader because of his statements that he might home school his children and the possibility that home-schooling his children, if it occurred, might adversely affect his time on the job and his attention to his duties. The balance at the time the decision was made by the Board clearly was in favor of the principal's right to suggest that he was considering home schooling to provide a religious education without any adverse employment consequences.

Different considerations might be before the Board (or the Court) at a later time were Peterson to follow through with his plan to home school (for example, if he presented a plan that required time commitments from him that prevented his performing adequately as principal), but that is not this case.

RYMER, Circuit Judge, dissenting:

I dissent because I do not believe that summary judgment was appropriate on Peterson's free exercise of religion claim. Since the district court presented this claim to the jury as one that Peterson had won, and for their consideration in determining what amount of damages to award, I would reverse the judgment on the jury's damage award. I therefore would not reach Peterson's cross-appeal of the district court's denial of his petition for attorney's fees.

There is no basis for assuming that Peterson engaged in conduct protected by the Free Exercise Clause.[1] As I read the record, Peterson did not prove—and perhaps cannot prove—that his expressed desire to home school was "rooted in religious beliefs," *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 218, 92 S.Ct. 1526, 1533–34, 1535, 32 L.Ed.2d 15 (1972), and that reassignment to a teacher's position "burden[ed][his] practice of … religion by pressuring him … to commit an act forbidden by [his] religion or by preventing him … from engaging in conduct or having a religious experience which the faith mandates." *Graham v. C.I.R.*, 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom. Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–49, 104 L.Ed.2d 766 (1989); *see also Vernon v. City of Los Angeles*, 27 F.3d 1385, 1393 (9th Cir.), *cert. denied*, 513 U.S. 1000, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994). The only evidence on the first point is Peterson's deposition testimony that he and his wife "determined that we would like to give our children their education based around a belief in God, as compared to an

---

1. We apply a three-part test to determine whether a termination violates the First and Fourteenth Amendments. As we explained in *Erickson v. Pierce County*, 960 F.2d 801 (9th Cir.), First, the terminated employee must establish that the conduct at issue was entitled to constitutional protection. Second, the employee must prove that the constitutionally protected conduct was a substantial or motivating factor behind the termination. Third, once the terminated employee has established the first two elements, the employer must prove that it would have made the same decision to terminate even if the employee had not engaged in the protected conduct.

*Id.* at 804 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), and *Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir.1989)), *cert. denied*, 506 U.S. 1035, 113 S.Ct. 815, 121 L.Ed.2d 687 (1992). In the realm of public school employment, the first prong of the *Mt. Healthy* test requires a dual inquiry. We first examine whether the school employee's conduct implicates a constitutional right, and if it does, we balance the interest of the employee in engaging in the conduct against the state's interest in promoting efficiency in the educational services that it provides through its public school employees. *See Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Gillette*, 886 F.2d at 1198. And on balance "[t]he state may legitimately interfere with the constitutionally protected conduct of a public school employee whenever that conduct materially and substantially impedes the operation or effectiveness of the educational program." *Brantley v. Surles*, 718 F.2d 1354, 1359 (5th Cir.1983); *see Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 509, 513, 89 S.Ct. 733, 737–38, 740, 21 L.Ed.2d 731 (1969).

education without that emphasis."[2] That doesn't come close to what the Supreme Court required in *Yoder* on the issue of whether the Amish parents' claim was "rooted in religious beliefs," and Peterson has cited to no other case suggesting that such testimony is sufficient to warrant summary judgment on a free exercise claim. Moreover, Peterson did not prove that Minidoka's actions caused any substantial, concrete harm to his freedom to practice his religion. Peterson is still free to believe in God as the creator and to teach his children that belief at home.

Even assuming Peterson's conduct enjoys protection under the Free Exercise Clause, there are genuine issues of material fact about whether, on balance, his right to engage in it is outweighed by Minidoka's interest in maintaining the effectiveness of its educational program, *see Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35, inasmuch as there is evidence that Peterson's conduct "materially and substantially impede[d] the operation or the effectiveness of the [Minidoka] educational program." *Brantley*, 718 F.2d at 1359; *see also Tinker*, 393 U.S. at 509, 89 S.Ct. at 737–38. As I see it, this case is a lot like *Gillette v. Delmore*, 886 F.2d 1194 (9th Cir.1989), *cert. denied*, 506 U.S. 1035, 113 S.Ct. 815, 121 L.Ed.2d 687 (1992), where we reversed a summary judgment against a fireman because, under the *Pickering* balancing test, there were genuine issues of material fact about whether the fireman's constitutionally protected speech actually "impair[ed] discipline by superiors or harmony among coworkers, ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[d] the successful operation of the [fire] department." *Id.* at 1198. Here, too, there are genuine issues of material fact about the negative impact of Peterson's con-

duct on the students and faculty and on his ability to perform as principal.

Minidoka presented evidence showing that after Peterson announced he was considering home schooling, several teachers began to wonder openly about his commitment to the public schools, to lose respect for him as their boss, and to question their own ability to teach. Minidoka also presented evidence that individual Board members and the school secretary at Paul Elementary received numerous calls from parents who were critical of Peterson's contemplation of home schooling. But the magistrate judge (and in turn the majority) resolve against Minidoka the reasonable inferences raised by this evidence; as the magistrate judge put it: "There is some evidence in this case from teachers that Peterson's consideration of home schooling for his children was creating tension and an unpleasant atmosphere; however this is also contradicted by evidence that the school year proceeded much as normal." Discrediting Minidoka's evidence in this way is for the trier of fact to do, not the court on summary judgment.

Most importantly, I believe there are genuine issues of material fact about whether Peterson's expressed contemplation of home schooling *for religious reasons* was a "substantial or motivating factor" in Minidoka's decision to reassign him. *Erickson v. Pierce County*, 960 F.2d 801, 804 (9th Cir.), *cert. denied*, 506 U.S. 1035, 113 S.Ct. 815, 121 L.Ed.2d 687 (1992). While there is no dispute that at some point Peterson told Superintendent Bishop that he wanted to teach his children at home for religious reasons, there is a substantial factual dispute about whether Minidoka factored *religion* into its decision to reassign Peterson. At best for Peterson, the evidence suggests that the Board's decision to reassign him was motivated by his ex-

---

**2.** Nothing in the record, for example, indicates that Peterson believes, as the majority opinion implies, that "[t]he belief in God as the creator, set out in the opening chapters of the Bible, is among the most basic and most pervasive of tenets in the biblical religions that have entered into our civilization. To relate that belief to education is a type of exercise of religion. Creation by God implies purpose and design in what

God has created. From the perspective of the believer God is not another category to be considered along with other forces, but a living presence guiding the teacher and the student." *Maj. op.* at 1356. Nor did Peterson ever indicate that his free exercise claim is "based on his personal sense of what his religion requires," as the majority opinion suggests. *Id.* at 1356.

pressed contemplation of home schooling, without regard to *why* he was so contemplating.[3] In fact, there isn't even a hint in the record that, if all else had been the same, Minidoka would not have reassigned Peterson if his contemplation of home schooling had been based on a desire to be closer to his children or on a belief that the teachers were not qualified. Here, as in *Mabey v. Reagan*, 537 F.2d 1036, 1041, 1045 (9th Cir.1976), the evidence is at least in conflict about why Peterson was reassigned, such that a trier of fact could conclude that his expressed contemplation of home schooling *for religious reasons* wasn't a "substantial" or "motivating" factor.[4]

Finally, whether or not Minidoka can satisfy the third prong of *Mt. Healthy*, there is enough evidence in the record regarding other reasons (like insubordination and noncooperation) for Peterson's reassignment that the school district, like the defendants in *Mt. Healthy*, *Allen*, and *Gillette*, should have a chance to show that it would have done what it did regardless. Neither the district court (nor the majority) even considers the issue.

I would, therefore, reverse.

---

**3.** The May 6, 1992 letter from Superintendent Pavlock to Peterson says that "[i]n light of your verbal notification to me that your children will be home schooled ... a professional assignment change will be made." The Board's Chair, David M. Elison, testified during his deposition that "I'd say the main consideration in regard to the decision which ultimately was made to reassign would have to do with the fact that [Peterson] was not willing to cooperate with the board and tell us what his intentions were regarding the matter which we felt would directly affect his administration in that building. He was reassigned not because he was going to home school, but because he just simply was not willing to work with the board in regard to that decision which he was going to make."

**4.** Indeed, Peterson's brief concedes as much, for he asserts "[i]n this case, there remains total confusion between the written documents and the contradictory testimony as to just when and why Mr. Peterson was demoted and reassigned."